486 A.2d 951

**Arthur J. HODGE**

v.

**Patricia HODGE, Appellant.**

**Arthur J. HODGE, Appellant,**

v.

**Patricia HODGE.**

Superior Court of Pennsylvania.

Argued Jan. 12, 1984.

Filed Nov. 30, 1984.

Reargument Denied Feb. 5, 1985.

Petition for Allowance of Appeal Granted Aug. 5, 1985.

Thomas B. Rutter, Philadelphia, for appellant (at No. 416) and appellee (at No. 417).

Charles E. Friedman, Harrisburg, for appellant (at No. 417) and appellee (at No. 416).

Before WICKERSHAM, DEL SOLE and MONTEMURO, JJ.

DEL SOLE, Judge:

This is an action in divorce pursuant to the Pennsylvania Divorce Code, 23 P.S. §§ 101 *et seq.*

The parties were divorced by a decree entered October 9, 1981. Economic issues were reserved for future determination. Claims for alimony, equitable distribution, counsel fees and expenses were subsequently heard by a Special Master. Both parties filed Exceptions to the Master's findings. On November 24, 1982, the Court of Common Pleas entered a final decree which included an award of alimony of $100 per week until September 26, 1994, when the parties' youngest child will reach majority. Both parties have appealed from that final decree.

The issue on appeal is what compensation, if any, is Mrs. Hodge entitled to under the Pennsylvania Divorce Code (the Code) for her contributions to her husband's medical education and license.

The factual situation of the case is as follows. Arthur Hodge was born on February 28, 1945, and Patricia Hodge was born on May 22, 1940. The parties met while Arthur was a medical technology student and Patricia was a clinical instructor at St. Lukes Hospital in Bethlehem, Pennsylvania. They were married on July 15, 1967. That same year, Arthur applied for a Commission in the United States Army Medical Service Corps. From 1967 through 1970, the parties lived at Fort Hood, Texas. The couple lived on Arthur's salary as a laboratory officer, while saving Patricia's earnings from her job as a laboratory technologist. Their first child, Laura, was born on September 28, 1968.

After his discharge from the Army, Arthur worked for approximately nine months as a serologist with Ortho-Pharmaceuticals of Raritan, New Jersey, earning $6,938.00.

Being unable to gain admission to an American medical school, in January of 1971, Arthur entered the Medical School of the University of Guadalajara, Mexico. During 1971, his family remained in Pennsylvania so that Patricia would be able to continue contributing earnings and savings to the expenses of Arthur's medical education.

From 1972 through 1974, Patricia and the child joined Arthur in Mexico. Their living conditions were far below those to which they were accustomed in the United States.

In 1975, the family returned to Pennsylvania and Arthur began a final year of student training at Harrisburg Polyclinic Hospital. A second child, Arthur, was born on June 30 of that year. In 1976, Arthur took an internship at Harrisburg Polyclinic Hospital. The parties' third child, Melanie, was born September 26 of that year.

Upon their return to the United States in 1975, the parties rented a small house in Schuylkill County for Patricia and Laura. Arthur lived in the physicians' residence at the

hospital. Patricia and the children are still living in that rented home.

In January of 1977, Arthur began a two year residency in Internal Medicine and received his license to practice medicine the following month. On August 27, 1977, Arthur announced that he no longer wished to continue in the marriage and moved in with a registered nurse named Julie Paland. Arthur completed his residence in December of 1978 and began the private practice of medicine.

Arthur is employed by another physician in a practice grossing $300,000 per year. He is paid $52,000 per year plus fringe benefits and bonus, plus $7,200 per year rental on his office, which is in the home he shares with Ms. Paland. Ms. Paland, as his office manager, is paid $15,900 per year, plus medical benefits.

Patricia is not employed. She has custody of the parties' three children. At the time of the hearing, her only income was $275 per week support from Arthur.

In her appeal, Patricia Hodge argues that the court should have equitably divided the value of Arthur Hodge's medical education, since the joint efforts and investment of the parties substantially increased Arthur's earning capacity and the marriage terminated before Patricia could enjoy the fruits of her investment.

A clear majority of courts that have considered the question of whether the advanced degree itself, or the increased earning capacity it represents, are divisible marital assets, have concluded that they are not. *Mahoney v. Mahoney,* 91 N.J. 488, 453 A.2d 527 (1982); *Frausto v. Frausto,* 611 S.W.2d 656 (Tex.Civ.App.1981); *DeWitt v. DeWitt,* 98 Wis.2d 44, 296 N.W.2d 761 (Ct.App.1980); *In re: Marriage of Graham,* 194 Colo. 429, 574 P.2d 75 (1978); *Wilcox v. Wilcox,* 173 Ind.App. 661, 365 N.E.2d 792 (1977). We agree with the majority view.

23 P.S. § 401 provides the framework for our analysis of the distribution of "marital property". Section 401(f) provides that "all property whether *real* or *personal* acquired

by either party during the marriage is presumed to be marital property ..." (emphasis supplied).

The question then becomes: Is potential increased earning capacity marital property if developed during the time of the marriage?

First, it is important to note that such a potential to earn more in the future is not limited to situations involving formal education. Rather, this potential can be a result of on-the-job training, in-job experience, apprenticeships or a host of other factors which make the labor of an individual more valuable in our society. Thus, the decision reached today is not limited to formal educational situations.

Clearly, increased earning capacity is neither real or personal property in any classic sense of the word. In the case of an advanced degree, the Colorado Supreme Court noted:

> An educational degree, such as an M.B.A., is simply not encompassed even by the broad views of the concept of "property". It does not have an exchange value or any objective transferrable value on an open market. It is personal to the holder. It terminates on death of the holder and is not inheritable. It cannot be assigned, sold, transferred, conveyed, or pledged. An advanced degree is a cumulative product of many years of previous education, combined with diligence and hard work. It may not be acquired by the mere expenditure of money. It is simply an intellectual achievement that may potentially assist in the future acquisition of property. In our view, it has none of the attributes of property in the usual sense of that term.

*In re: Marriage of Graham,* supra, 574 P.2d at 77.

Our analysis of the Divorce Code also supports the conclusion that the legislature did not intend increased earning capacity to be a divisible asset. Section 401(d)(4) provides that one of the factors to be considered in distributing marital property is "the contribution by one party to the education, training, or increased earning power of the

other party" ... It is logical to conclude from that statement that increased earning power *itself* is not marital property. Also, § 501(b)(1) and (6) provide that in determining the amount, nature and duration of alimony the court should consider the earning capacity of the parties and the contribution made by one spouse to the other's increased earning power. The inclusion of the latter section makes it obvious that the legislature was concerned with and did consider situations such as that presented here, involving marriages where the divorce occurs before the parties acquired substantial marital property, but one spouse has developed the potential for vastly increased earnings. Had the parties in this case acquired substantial real or personal property prior to the divorce, and had Mrs. Hodge received a substantial portion of that property pursuant to § 401(d)(4), it is doubtful anyone would argue she would be entitled to a share of her husband's future earnings as a divisible asset. Since the parties did not accumulate such property, the trial court properly considered Mrs. Hodge's contributions to her husband's professional education and earning capacity in awarding alimony.

We turn now to Arthur Hodge's cross-appeal, in which he argues the court violated § 501(c) of the Code by ordering alimony for a period of almost fourteen years. Section 501(c) provides as follows:

(c) Unless the ability of the party seeking the alimony to provide for his or her reasonable needs through employment is substantially diminished by reason of age, physical, mental or emotional condition, custody of minor children, or other compelling inpediment to gainful employment, the court in ordering alimony shall limit the duration of the order to a period of time which is reasonable for the purpose of allowing the party seeking alimony to meet his or her reasonable needs by:

(1) obtaining appropriate employment; or

(2) developing an appropriate employable skill.

According to Dr. Hodge, Patricia could develop an appropriate employment skill with two more years of education.

Therefore, the alimony award should be for a two year period only.  This argument is without merit.

■  The record indicates that Patricia Hodge is forty-four years old, has not worked for ten years, has custody of three minor children, and has some physical impairment. She has a two year associate degree in medical technology. However, potential employers where she resides now require a four year degree.  These impediments to employment would exempt Mrs. Hodge from the limitations provided in § 501(c)(1) and (2).

Even more important, Dr. Hodge had ignored § 501(b) which provides:

(b) In determining whether alimony is necessary, and in determining the nature, amount, duration and manner of payment of alimony;  the court shall consider all relevant factors including:

(1) The relative earnings and earning capacities of the parties.

(2) The ages, and the physical, mental and emotional conditions of the parties.

(3) The sources of income of both parties including but not limited to medical, retirement, insurance or other benefits.

(4) The expectancies and inheritances of the parties.

(5) The duration of the marriage.

(6) The contribution by one party to the education, training or increased earning power of the other party.

(7) The extent to which it would be inappropriate for a party, because said party will be custodian of a minor child, to seek employment outside the home.

(8) The standard of living of the parties established during the marriage.

(9) The relative education of the parties and the time necessary to acquire sufficient education or training to enable the party seeking alimony to find appropriate employment.

(10) The relative assets and liabilities of the parties.

(11) The property brought to the marriage by either party.

(12) The contribution of a spouse as homemaker.

(13) The relative needs of the parties.

(14) The marital misconduct of either of the parties during the marriage; however, the marital misconduct of either of the parties during separation subsequent to the filing of a divorce complaint shall not be considered by the court in its determinations relative to alimony.

■ The provisions of § 501 must be read in conjunction with each other and with the intent and purpose of the Code as a whole, so that economic justice results. *Bickley v. Bickley*, 301 Pa.Super. 396, 447 A.2d 1025 (1982).

■ In this case, the trial court correctly considered all of the factors set out in the Code in determining that Mrs. Hodge was entitled to a long-term alimony award, including her contribution to Dr. Hodge's education and increased earning power. The court concluded that an award of $100 per week until September 26, 1994, was supported by the evidence concerning needs and ability to pay. We find no abuse of discretion by the trial court concerning that order.

Further, it should be noted that § 501(e) provides as follows:

Any order entered pursuant to this section is subject to further order of the court upon changed circumstances of either party of a substantial and continuing nature whereupon such order may be modified, suspended, terminated, reinstated, or a new order made ...

Should the relative economic circumstances of the parties change in the future, either party may petition the court for an increase or reduction of the award.

Decree affirmed.

WICKERSHAM, J., filed a concurring and dissenting opinion.

160

WICKERSHAM, Judge, concurring and dissenting:

This is an action in divorce, pursuant to the Pennsylvania Divorce Code, 23 P.S. §§ 101, *et seq.* (hereinafter the "Code").

On October 9, 1981, a Decree in Divorce was entered divorcing plaintiff, Dr. Arthur Hodge, from defendant, Patricia Hodge, and reserving the economic issues for future determinations (R. 2a). The economic issues, including claims for alimony, equitable distribution of marital property, counsel fees, and expenses, were heard by Special Master Louis J. Adler, Esquire, at hearings held on January 29, March 12, March 19, and March 23, 1982. On June 21, 1982, the Special Master filed his report and recommendations on the economic issues, following which both parties filed exceptions (R. 6a). The exceptions were heard before the Honorable William W. Lipsitt, of the Court of Common Pleas of Dauphin County, on August 19, 1982, after which Judge Lipsitt entered a final decree, dated November 24, 1982. It is from this final decree that this appeal follows.

The issue is what compensation, if any, by means of equitable distribution or alimony, Mrs. Hodge is entitled to, to compensate her for her investment, both financial and otherwise, in Dr. Hodge's medical education and license and the resultant increase in his earning capacity. This issue, a matter of first impression for the appellate courts of this Commonwealth, is whether the lower court erred in refusing to equitably divide upon divorce the increased earning capacity of a spouse, who earned a medical degree, through the joint efforts, both financial and otherwise, of both spouses. Specifically, we must determine whether Patricia Hodge is entitled to compensation for the financial and other contributions she made toward Dr. Hodge's attainment of an M.D. degree and license to practice medicine. I dissent from the majority conclusion on this issue.

Dr. Hodge filed a cross-appeal averring that the lower court erred in awarding Mrs. Hodge, a housewife supporting three minor children, alimony for longer than the two years it would take her (on a full-time study program) to

complete her college education. I concur in the majority's treatment of this issue.

Plaintiff/Appellant, Arthur J. Hodge, M.D. [1], was born on February 28, 1945 (N.T. 373) [2] and defendant/appellee, Patricia Condrack Hodge, was born on May 22, 1940 (N.T. 7). The parties were married on July 15, 1967 (N.T. 7), having met while Arthur was a student in medical technology at St. Luke's Hospital in Bethlehem, Pennsylvania, and Patricia was a clinical instructor, providing on-the-job training at the same institution (N.T. 374–75).

In 1967, in lieu of being drafted to serve in Viet Nam, Arthur applied for a commission in the United States Army Medical Service Corps, because "three years as an officer is a lot better than two years as an enlisted man" (N.T. 375). Hence, for the years 1967 through 1970, the Hodges lived at Fort Hood, Texas, where Dr. Hodge served as a laboratory officer and Mrs. Hodge served as a laboratory technologist at Darnell Army Hospital. Dr. Hodge, then Mr. Hodge, rose to the rank of Captain,[3] and the couple lived off Captain Hodge's salary while they saved Mrs. Hodge's earnings (N.T. 375–78, 382).

After his discharge from the Army, Dr. Hodge became employed as a serologist with Ortho-Pharmaceutical of Raritan, New Jersey, where he remained for approximately nine months (N.T. 378–79). His earnings for the year 1970, while employed at Ortho-Pharmaceutical, as reflected in his

---

1. Mrs. Hodge appealed from the lower court's Decree of November 24, 1982. Dr. Hodge filed a cross-appeal. Since Dr. Hodge was the plaintiff below, he became appellant in this court, pursuant to Rule 2136 of the Pennsylvania Rules of Appellate Procedure.

2. Citations are to the reproduced record and to the Notes of Testimony (N.T.) adduced before the Special Master.

3. Dr. Hodge described his military career as follows:
"Yes, when I went in, I went in as a second lieutenant. I believe it was about in one year's time I got promoted all the way up to captain, because Vietnam was even getting worse, it was about 1968 when (sic) TET offensive was going and they started these blood donor programs at each of the posts, so because I was in the right place at the right time, I got the promotion and we began running big blood programs and sending the blood over to Vietnam." (N.T. 376)

W–2 Form, totaled $6,938.00 (R. 53a) which, when extrapolated for twelve months' employment, established annual earnings for Arthur at that time of $9,250.00 (R. 74a). The Hodges shared an apartment during this period of time, along with their daughter, Laura, who was born on September 28, 1968.

In January, 1971, Dr. Hodge, being unable to gain admission to an American medical school, matriculated at the Medical School of the University of Guadalajara, Mexico (N.T. 379). Dr. Hodge continued as a student at the Guadalajara Medical School from 1971 through 1974. During the first year of his matriculation, at Dr. Hodge's suggestion, Mrs. Hodge and their daughter remained and lived in Pennsylvania, so that she might continue contributing earnings and savings to the expenses of Dr. Hodge's medical education.[4]

During the balance of Dr. Hodge's matriculation at Guadalajara Medical School, his wife and child lived with him. Their living conditions in Mexico, while equivalent to those of other medical students, were far below the acceptable living conditions which they had become accustomed to in the United States (N.T. 22–24).

In January, 1975, the family returned to Pennsylvania and Dr. Hodge embarked upon a final year of medical student training at Harrisburg Polyclinic Hospital, under the Hahnemann Medical College and Hospital Fifth Path-

4. An anomaly of this case is that Mrs. Hodge, prior to her marriage to Arthur Hodge, had questioned the desirability of marriage, since she feared Arthur would follow a pattern that she had seen followed by other physicians during her experience at St. Luke's Hospital; namely, divorces and marital interruptions occurring after the physician's education was completed, and he was exposed to the temptations of his status of "doctor" (N.T. 13, *et seq.*). In any event, Arthur Hodge's father and father-in-law each testified that, in response to Mrs. Hodge's concerns, Arthur had assured everyone that a goal of his medical education was to provide his wife and family with "a decent life" (e.g., N.T. 358, 371–72). Indeed, to the extent that Dr. Hodge's education expenses did not come from savings or earnings generated by Mrs. Hodge or the marriage, payments came from his own parents, his in-laws, and a $5,500 loan from the Pennsylvania Higher Education Authority.

way Program, made necessary by the fact that he had trained at a foreign medical school (N.T. 390). In 1976, Dr. Hodge took an Internship at Harrisburg Polyclinic Hospital (N.T. 391). In 1975 and 1976, while Dr. Hodge was at the Harrisburg Polyclinic Hospital, his family continued to live in a small, rented home in Schuylkill County, Pennsylvania, while Dr. Hodge ostensibly lived in the physicians' residence quarters at the Harrisburg Polyclinic Hospital (N.T. 394–95). At that time, the Hodge family had grown to include their second child, Arthur, who was born January 30, 1975, and their third child, Melanie, who was born September 26, 1976.

In January, 1977, Dr. Hodge commenced a two-year residency program in Internal Medicine and became licensed to practice medicine in the Commonwealth of Pennsylvania in February of that year (N.T. 392–93). On August 27, 1977 during one of his visits to his family, who continued to reside in Schuylkill County, Dr. Hodge removed certain personalty from the family home and left a note for his wife, announcing his inability to continue in the marital relationship (N.T. 38–43). Thereupon, Dr. Hodge moved directly into residence with one Julie Paland, a registered nurse, whom he met in May of 1977, at the Harrisburg Polyclinic Hospital (N.T. 409 *et seq.*). Having completed his residency in December, 1978, Dr. Hodge commenced the private practice of medicine. Ms. Paland is both his room-mate and his office manager (N.T. 488, *et seq.*).

In the private practice of medicine, under an employer-employee relationship with another physician, Dr. Hodge is paid $52,000.00 per year, plus certain fringe benefits (N.T. 399–444), plus bonus (N.T. 439), plus $7,200 per year rental on his office, which is in his home (N.T. 406). Ms. Paland is paid $15,900 per year, plus Blue Cross and Blue Shield benefits (N.T. 449–56). The gross income of his practice is $300,000.00 per year (N.T. 438). Finally, as already noted, Dr. Hodge was granted a divorce on October 9, 1981.[5]

5. Our review of the facts is taken with approval as to accuracy from the brief for appellee, pages 2–6.

In *Remick v. Remick*, 310 Pa.Super. 23, 456 A.2d 163 (1983), we held that alimony orders under the Code should be reviewed only for an abuse of discretion and not broadly, as in the case of the actual Divorce Decree, or an award of custody of children. Likewise, "[t]he equitable distribution of marital property is within the sound discretion and judgment of the lower court and its decision shall not be disturbed on appeal absent an abuse of that discretion." *Gee v. Gee*, 314 Pa.Super. 31, 35, 460 A.2d 358, 360 (1983).

The factual situation presented by the instant appeal is a classic one, whereby the husband earns a professional degree (e.g., M.D., J.D.), and the wife—in this case, Patricia Hodge—works to support the family, contributes to her husband's educational costs, provides a home, accepts a lower standard of living and depletion of their marital assets, with the intention that their joint efforts will be rewarded by her husband's increased earning capacity and a better and higher standard of living when the schooling or training is completed. The classic situation finds the marriage broken up before any of the fruits of the joint effort are obtained. Since the couple's marital earnings and savings are dissipated to support the family and to meet the

Appellee counterstates the questions involved as follows:
    I. Whether the lower court should have equitably divided and distributed between the parties the value of the investment made by the parties in the "human capital" represented by Appellant's medical education when the joint efforts and joint investment of the parties created a substantial increase in Appellant's earning capacity and when the marriage terminated prior to the realization of the fruits of their joint labor?
    II. Whether alimony should be limited to the two years it would take Appellee to obtain her college degree when her ability to provide for her needs through appropriate employment is limited by the need to care for the parties' three minor children?
Brief for Appellee at 1.
    Appellant, Arthur J. Hodge, states the question involved as being:
    The Lower Court erred in failing to limit the duration of the Order of Alimony to a period of time which is reasonable for the purpose of allowing Patricia Hodge to meet her reasonable needs by obtaining appropriate employment or developing an appropriate employment skill.
Brief for Appellant at 4.

husband's educational expenses, there is virtually no property subject to equitable distribution upon divorce.

In the instant case, the Hodge marriage terminated when Dr. Hodge left the marital home in August, 1977, in the midst of his residency and before he commenced private practice in the field of Internal Medicine. At the termination of the Hodge marriage, Dr. Hodge left with his medical degree and a license to practice medicine, with a future of increased earnings and a higher living standard. Mrs. Hodge, on the other hand, was left with a lease on a small rental home, and the responsibility to care for three minor children.

The problem which thus arises, is how a court can equitably divide the increased earning capacity of Dr. Hodge to reward Mrs. Hodge for her efforts and prevent unjust enrichment to Dr. Hodge. In short, does the Pennsylvania Divorce Code provide a means for a court to cause economic justice to be done in such a situation? I would hold that it does.

The Pennsylvania Divorce Code, 23 P.S. § 102, states the legislative findings and intent behind its enactment:

(a) The family is the basic unit in society and the protection and preservation of the family is of paramount public concern. Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to:

(1) Make the law for legal dissolution of marriage effective for dealing with the realities of matrimonial experience.

. . . .

(4) Mitigate the harm to the spouses and their children caused by the legal dissolution of the marriage.

. . . .

(6) Effectuate economic justice between parties who are divorced or separated and grant or withhold alimony according to the actual need and ability to pay of the parties and insure a fair and just determination and settlement of their property rights.

(b) The objectives set forth in subsection (a) shall be considered in construing provisions of this act and shall be regarded as expressing the legislative intent.

Keeping in mind the purposes behind the Divorce Code of effectuating economic justice between the parties, and insuring a just settlement of property rights, the Code authorizes the court to enter an order "... determining and disposing of existing property rights and *interests* between the parties...." 23 P.S. § 401(b) (*emphasis added*). The Code refers specifically to the division of property rights *and interests*, making clear the legislative intent that the court is to broadly determine the property interests of the parties, and is not limited to physical property, in its equitable distribution awards.

Furthermore, in section 401(c), the court is granted the full power to do economic justice.

(c) In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this act, and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

In ordering an equitable division of the property of the parties, the legislature specified the factors the court should consider in reaching an equitable distribution of marital property. Section 401(d) specifically recognized the injustice inherent in the break-up of a marriage, whereby one spouse benefits by the joint efforts of both partners in the obtaining of a higher educational degree and it specifically ordered the court to consider such factors in formulating its equitable division of property:

(d) In a proceeding for divorce or annulment, the court shall, upon request of either party, equitably divide, distribute or assign the marital property between the parties without regard to marital misconduct in such proportions

as the court deems just after considering all relevant factors including:

. . . .

(4) The contribution by one party to the education, training, or increased earning power of the other party.

. . . .

(7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as homemaker."

It is thus clear from a reading of the Divorce Code that the legislature intended, and the court is specifically empowered, to promote economic justice. In the instant case, the lower court abused its discretion in failing to follow the statutory mandate, by not compensating Mrs. Hodge for her contribution and investment in the "human capital" represented by Dr. Hodge's medical degree and its resultant increase in earning capacity.

Pursuant to the language and intent of the statute, which recognizes the increased earning capacity as a divisible asset, the necessary conclusion is that, under our Divorce Code, we should order equitable distribution of the intangible asset created by this joint effort of the parties.

Although the Code in section 501(c) allows for permanent alimony, the emphasis of alimony in Pennsylvania is rehabilitation. Alimony is awarded until the dependent spouse obtains employment or develops an appropriate employment skill 23 P.S. § 501(c). In the instant case, no award of alimony will equalize the parties' economic situation. Dr. Hodge, thanks to the investment and contributions of both parties, presently earns $52,000.00 per year (N.T. 439), with a much greater earning capacity for the future. Mrs. Hodge, while caring for her children, could possibly earn $5,000.00 per year as a salesclerk, with her potential, upon completion of her two remaining years of college, being $15,000.00 per year (R. 25a). In short, Mrs. Hodge is left with no return on her investment of earnings and hard

work in the human capital represented by her husband's increased earning power—his medical degree.

The Pennsylvania Divorce Code permits an award of permanent alimony, as opposed to support or rehabilitative alimony, only under very limited circumstances. 23 P.S. § 501(c). The failure of the lower court to equitably divide and distribute the value of the investment in Dr. Hodge's earning capacity created a great economic disparity between the parties that the Divorce Code was intended to prevent (See 23 P.S. § 102, Legislative findings and intent). While Dr. Hodge is living in a home which he owns, worth approximately $72,000 (N.T. 405), Mrs. Hodge and the parties' three minor children are living in a rental home which is in poor condition.[6] Dr. Hodge, who earns $52,000 per year, plus $7,200 per year rental for his office in his home, lives with his current paramour, who contributes $10,000 per year to their living expenses.

The most important discrepancy, however, is apparent in the future earnings potential of the parties. Dr. Hodge, a specialist in internal medicine, and an employee of a practice grossing $300,000 per year, has the potential for a bright and wealthy future—the future Mrs. Hodge thought she would share with her husband, in return for her investment in his medical degree. Mrs. Hodge, by contrast, cannot even work in her field of medical technology.[7] Mrs. Hodge's future prospects are bleak, augmented by her limited educational background and the necessity of remaining at home to care for the parties' three minor children.

---

6. Mrs. Hodge and her children are living in the same home the parties rented while Dr. Hodge was in his training program at Harrisburg Polyclinic Hospital.

7. While Mrs. Hodge is licensed, and has a two-year associate's degree in medical technology, the potential employers in the geographic location where she resides require four-year degree medical technologists (N.T. 505). Had Mrs. Hodge not left her employment to join her husband in Mexico during his medical school training, she would have been able to remain at the hospital with her two-year training, already being an employee there (N.T. 112). This is a change in the professional employment requirements which occurred since Mrs. Hodge was last employed as a medical technologist.

The lower court's award of alimony of $100 per week until September 26, 1994 is not sufficient, alone, to compensate Mrs. Hodge for her contributions to Dr. Hodge's present earning abilities, and does not create economic justice between the parties, in light of their joint contributions to the joint venture, the medical education, and their intentions at the time.

The solution to the problem arising from the termination of a marriage before the non-degree earning spouse has the opportunity to enjoy the fruits of her labor, which is in full compliance with the intent and purposes of the Pennsylvania Divorce Code, is to equitably divide the increased earning capacity of Dr. Hodge, so as to compensate Mrs. Hodge for her investment, financial and otherwise, in the attainment of his medical degree.

From an economic standpoint, the concept is quite simple, and is not much different from that followed in this Commonwealth in evaluating loss of future earning capacity in other types of litigation.

The economic concept advanced by Mrs. Hodge in this case may be simply stated: investment in human capital, analogous to investment in physical capital, occurs when an individual (or a group of individuals, such as a husband and a wife) invests funds, efforts, and energies in the creation of an intangible asset or property interest amenable to valuation in economic terms. Here, the asset created by the parties is the ability to practice medicine received by Dr. Hodge, via medical training whereby his career orientation and earning capacity shifted from medical technologist/serologist to licensed practitioner in the medical arts/science of internal medicine.[8]

8. The same asset creation occurs in any educational context, or practical training context, be it in the progress from high school graduate to auto mechanic or in the progress from high school graduate to brain surgeon. Indeed, such asset creation and concomitant creation of economic value is frequently discussed in educational journals and federal government publications whereby this "value" of continuing education is recorded.

The value of that asset is measured simply by the difference between earning capacity in the preadvanced education status and earning capacity in the postadvanced education status.

Here, for example, the value of the intangible asset possessed by the parties before the Guadalajara Medical School/Harrisburg Polyclinic Hospital training is measured by the earning capacity of a medical technologist/serologist.[9] Since Dr. Hodge's earnings for nine months of employment as a medical technologist in 1970 were, as shown by his W-2 Form, $6,938.00 (R. 53a), his annual earnings at that employment at that time would have been $9,250.00 (R. 74a). In turn, his earnings in 1979 in that same employment would have been $20,000.00, assuming increments in that salary equal to the increments in average white collar wages over that same period of time in all occupations (R. 74a-75a).[10]

Similarly, the value of the intangible asset possessed by the parties after Dr. Hodge's Guadalajara Medical School/Harrisburg Polyclinic Hospital experience is measured by the earning capacity of a physician engaged in private practice as a specialist in internal medicine. In this instance, and without regard to national averages for physicians practicing that specialty, Dr. Hodge's own records show that earning capacity to be $52,000.00 per year, without inclusion of fringe benefits or deferred compensation (N.T. 439).

Accordingly, from the economist's point of view, the incremental value of the intangible asset created by the parties in this case, the asset denominated "ability to practice Internal Medicine," is valued at $32,000.00 per year.

9. This value is higher, of course, than the value of a simple college education (e.g., a B.A. from Wilkes College such as Dr. Hodge possessed before his medical technologist training) or a high school diploma, due to the value of the medical technology training received by Dr. Hodge at St. Luke's Hospital.

10. Dr. Hodge has offered no evidence to suggest that the extrapolated $20,000 figure is too low; hence, it is proper for the court and for expert Verzilli to rely upon this annualized extrapolation based upon figures published by the federal government.

Then, having in mind Dr. Hodge's age, and assuming a work life expectancy to age 65, the value of that intangible asset—the value of that ability to practice Internal Medicine—over the course of the remaining thirty-one (31) years is $992,000.00 (R. 76a).[11]

Indeed, the recognition of this asset and its valuation represents no new departure in the jurisprudence of this Commonwealth. This Commonwealth has no difficulty in evaluating the increased earning power represented by a professional license in a wrongful death or survival action. For example, in *Hall v. George*, 403 Pa. 563, 170 A.2d 367 (1961), the Pennsylvania Supreme Court, in a wrongful death action, sustained an award predicated upon lost earning capacity based upon a school teacher's salary even though the testimony showed only that plaintiff's decedent was an eighteen year old college freshman who enjoyed excellent health, had admirable traits and evidenced a desire and ability to become a school teacher. The court allowed a determination of lost earnings potential based upon a comparison between earnings of the decedent for two years prior to his death and the salary that a teacher could expect to earn in Pennsylvania. *Whittle v. Schemm*, 402 F.Supp. 1294 (E.D.Pa.1975), *aff'd*, 538 F.2d 322 (3d Cir.1976) permitted a student with eye injuries to recover damages based upon his potential earnings as an architect. This, notwithstanding the fact that, at the time of his injury, plaintiff was only a first-year student at a junior college. *Hoffman v. Sterling Drug Co., Inc.*, 374 F.Supp. 850 (M.D.Pa., 1974) is in accord. There, Judge Herman acknowledged that Pennsylvania does not restrict a recovery to the specific earnings at the time of the injury. Rather, Pennsylvania

---

11. This valuation, reflecting an ability to earn a specific sum in annual increments over the years, has not been reduced to present value on the assumption, espoused by the Pennsylvania Supreme Court in *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), that inflationary increases in the principal annual sum would offset the effect of discounting. Neither has there been any attempt to project future or annual earnings increases based upon productivity. In short, the valuation of the intangible asset here advanced is by far the most conservative possible method of valuation.

has adopted the "economic horizon" test which holds that, "It is not the status of the immediate present which determines capacity for remunerative employment." *Id.* at 860, quoting *Bochar v. J.B. Martin Motors, Inc.,* 374 Pa. 240, 244, 97 A.2d 813, 815 (1953). Recoveries for lost future earnings should not be restricted to computations based upon the position held "at the moment" of the injury (or, in this case, at the moment of separation).

*Frankel v. Heym,* 466 F.2d 1226, 1229 (3d Cir., 1972) is of the same view. There, the Court held that a nineteen year old commerical art student could recover lost wages premised upon the theory that she would have found work as a commercial artist. Finally, this court recently permitted the estate of an eleven year old boy to collect damages for lost earnings. See, *Freeze v. Donegal Mutual Insurance Co.,* 301 Pa.Super. 344, 447 A.2d 999 (1982), *aff'd,* 504 Pa. 218, 470 A.2d 958 (1983). In footnote 10 to the opinion, this court cited with approval a series of cases, some of which are more than sixty (60) years old, which permit future wage loss calculations for persons who had never worked, including calculations for three, seven, eight, and ten year olds.

We recently recognized that the settlement of a wife's personal injury suit is marital property subject to equitable distribution. *Platek v. Platek,* 309 Pa.Super. 16, 454 A.2d 1059 (1982). The equitable distribution of a spouse's increased earning capacity is the next step.

I would hold that the investment of human capital in the ability to practice medicine is a joint property interest which is subject to equitable distribution upon dissolution of the bonds of marriage. That conclusion, I believe, is compelled by the language and purpose of the Divorce Code.

We must then settle upon a method of valuation of that jointly-shared property right or interest. That valuation, I believe, is most accurately defined by a comparison of earning capacities, using the earning capacity after the education or advanced degree as the basis from which one subtracts the earning capacity before the education and,

having arrived at the difference, applying the multiplier reflecting the remaining work life expectancy. This method of valuation is universally accepted by the courts of this Commonwealth in other types of cases (*Cf. Pennsylvania Suggested Standard Jury Instructions, Chapter VI: Damages*).

There then remains only the question of what constitutes "equitable" distribution in the instant case. If the asset were one of the more customary types, e.g., a jointly-owned apartment house, it could be "equitably" distributed by starting from a presumption of 50–50 ownership and then changing the percentage based on the factors mentioned in section 401(d). Here, I believe the court can, and should, do no less. The increased earning capacity of Dr. Hodge arising out of the efforts whereby he, jointly with his wife, attained the degree of education and specialization he now possesses, is no different in quality from the increased earning capacity which should have flowed from acquiring another asset, e.g., the apartment house already mentioned.

Given the nature of the asset, I would find that the lower court abused its discretion pursuant to sections 401 and 404 of the Code, in holding that the value of the increased earning capacity of Dr. Hodge, which was created by the joint efforts of the parties, was not marital property subject to equitable distribution. I would, therefore, remand to allow the lower court to determine the value of Dr. Hodge's increased earning capacity, and the percentage of that value to be awarded to each party pursuant to the factors enumerated in 23 P.S. § 401. The Pennsylvania Divorce Code, in seeking to promote economic justice between the parties upon divorce, requires no less. I dissent from the majority finding to the contrary.

## CROSS-APPEAL

Dr. Hodge filed a cross-appeal, averring that the lower court erred in awarding alimony to Mrs. Hodge until September 26, 1994. Dr. Hodge contends that since Mrs. Hodge had only two years left to complete her college

degree, which would enable her to obtain employment in her geographic locality, the alimony should, pursuant to section 501(c), be limited to two years.

A reading of section 501(c) of the Divorce Code, makes it clear that the lower court did not abuse its discretion in awarding alimony until the Hodge children reach majority. Section 501(c) provides that spouses, such as Mrs. Hodge, are exempt from the limitations provided in 501(c)(1) and (2). Instantly, Mrs. Hodge has custody of the parties' minor children, has some physical impairment, and is faced with other compelling impediments to attaining gainful employment. Accordingly, under the facts of the instant case, it was appropriate for the lower court to award alimony for the duration of their children's minority, and I concur in the majority opinion in so finding.