**Karen Schumann MARCHANT, Plaintiff and Appellant,**

v.

**Donald J. MARCHANT, Defendant and Respondent.**

No. 860250–CA.

Court of Appeals of Utah.

Sept. 18, 1987.

Craig M. Peterson, E. Paul Wood, Littlefield & Peterson, Salt Lake City, for appellant.

Hans Q. Chamberlain, Chamberlain & Higbee, Cedar City, for respondent.

Before ORME, DAVIDSON and GARFF, JJ.

DAVIDSON, Judge:

Plaintiff Karen Marchant and defendant Donald Marchant were married on September 8, 1967, when they were both college students. Plaintiff completed one more year of study before taking a job while defendant continued his education, received a degree in civil engineering, and completed two semesters of postgraduate studies. Defendant has been employed by the U.S. Forest Service for the majority of his working life while plaintiff did not return to the work force on a full time basis until late in the marriage.

The Marchants found they were unable to have children and consequently adopted two infants: a boy in April 1974 and a girl in April 1977. During 1976, the couple purchased a home and a farm in Central, Sevier County, Utah and resided there until their separation.

During 1982, plaintiff began working for a medical organization which maintained an office in Richfield, Utah. Defendant appears to have resented both his wife's employment and the working relationship between plaintiff and her male supervisor. The previous strains on the marriage grew correspondingly and the relationship deteriorated. There were attempts at counseling but these proved unsuccessful. During an argument concerning the state of the marriage, defendant struck plaintiff, causing her to lose consciousness. The final separation followed immediately.

Defendant vacated the family home during March 1985 and plaintiff filed her Complaint for Divorce on August 5, 1985. The court subsequently approved a stipulation entered into by the parties which provided that defendant have temporary possession of the real property, that he pay plaintiff temporary child support, and that plaintiff have temporary custody of the children subject to defendant's visitation rights. Plaintiff and the children then moved from Central to Salt Lake City, where plaintiff's sister and her child resided with them.

Trial to the court was held on June 18, 1986. The Decree of Divorce awarded custody of the children to defendant. There was no award of alimony or child support. Real and personal property was divided and plaintiff was awarded a $6,000.00 interest in defendant's retirement, payable over a ten-year period at $600.00 per year with accrued interest at the rate of 8% per annum. Defendant regained custody of the children on July 1, 1986, and returned them to their previous home in Sevier County. Plaintiff filed her Notice of Appeal on September 24, 1986.

Several issues are presented to this Court for review: (1) are there sufficient findings of fact upon which to base the award of custody; (2) was there an equitable distribution of defendant's retirement asset; (3) was it an abuse of discretion for the court to specify a judgment interest rate of 8% per annum rather than that provided by statute; (4) did the court abuse its discretion by not awarding alimony to plaintiff; and (5) did the court err in

not awarding plaintiff the value of her previous personal injury awards prior to the distribution of the parties' assets?

Because the trial court's findings of fact are essential to our analysis, we find it necessary to recite the following findings of that court:

3. The Court finds that Defendant has treated the Plaintiff cruelly, both mentally and physically, and that the parties simply cannot continue to maintain the marital relationship. By reason of the same, Plaintiff is entitled to a Decree of Divorce, final and effective upon entry. . . .

. . . . .

5. In determining what is in the best interests of the children for purposes of determining custody, the Court makes the following specific findings:

A. That both the Plaintiff and Defendant are good parents, and that both parties could be awarded custody of the minor children.

B. That the marriage entered into between Plaintiff and Defendant was broken by the actions on the part of Plaintiff, which were not justified.

C. That when the Plaintiff vacated the family home in Central, Utah, and moved to Salt Lake City, Utah, in September of 1985, she moved into an apartment and in approximately November or December of 1985, her sister, another woman who is divorced, moved in with her, together with her minor child. That the standard of living under which Plaintiff has been residing while having the temporary custody of the children in Salt Lake City, Utah, is not what it should have been nor was it in the best interests of the children.

D. That during the latter part of the marriage between Plaintiff and Defendant, Plaintiff became involved with another man and this fact had an influence with the Court in determining what is in the best interests of the minor children.

E. That during the latter years of the marriage, Plaintiff's lifestyle changed and that change was not in the best interests of the family unit, but rather the change was pursuant to Plaintiff's desires and for her benefit to the exclusion of the family unit.

. . . . .

8. The Court finds that Plaintiff is not entitled to alimony.

. . . . .

10. The Court finds that as of June 18th, 1986, Plaintiff receives as net income the sum of $1,321.00 per month, and Defendant receives net income in the sum of $2,114.00 per month.

11. The Court finds that Defendant has a vested interest in his retirement by reason of his U.S. Government employment in the approximate sum of $18,000, as of June 18th, 1986, and that Defendant should be awarded all of the right, title and interest in said retirement, provided, however, that Plaintiff is entitled to $6,000 by reason of said vested interest. Said sum shall be payable by the Defendant to the Plaintiff over a ten year period, together with interest at the rate of 8% per annum, payable at the rate of $600.00 per year, together with accrued interest. . . .

## FINDINGS OF FACT

■ Utah R. Civ. P. 52(a) states that findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." We are bound to follow that rule together with the guidance of the Utah Supreme Court in the recent case of *Acton v. Deliran,* 737 P.2d 996, 999 (Utah 1987), in which the Court reviewed the case law concerning findings of fact. There the Court stated: "Failure of the trial court to make findings on all material issues is reversible error unless the facts in the record are 'clear, uncontroverted, and capable of supporting only a finding in favor of the judgment,'" and the findings " 'should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each fac-

tual issue was reached'" (citations omitted). Particularly important is the Court's citation of *Smith v. Smith*, 726 P.2d 423, 426 (Utah 1986), a child custody matter, in which it declared "[p]roper findings of fact ensure that the ultimate custody award follows logically from, and is supported by, the evidence and the controlling legal principles." We understand this to mean that a custody award must be firmly anchored on findings of fact that (1) are sufficiently detailed, (2) include enough facts to disclose the process through which the ultimate conclusion is reached, (3) indicate the process is logical and properly supported, and (4) are not clearly erroneous. *See also Sanderson v. Tryon*, 739 P.2d 623, 626 (Utah 1987) and *Rucker v. Dalton*, 598 P.2d 1336, 1338 (Utah 1979). If this is not accomplished by the trial court, the issue of custody must be reversed unless the record itself supports the award to the standard reiterated in *Acton.*

## CUSTODY AWARD

"In determining custody, the court shall consider the best interests of the child and the past conduct and demonstrated moral standards of each of the parties." Utah Code Ann. § 30–3–10 (1984). No one set list of factors concerning the best interests of the child can govern custody determinations in all cases. *Smith*, 726 P.2d at 426. In *Pusey v. Pusey*, 728 P.2d 117, 120 (Utah 1986), the Supreme Court wrote that the choice in "competing child custody claims" should be based on "function-related factors." A complete list of those factors was not set down but the following were determined to be prominent: (1) "the identity of the primary caretaker during the marriage," (2) "the identity of the parent with greater flexibility to provide personal care for the child," (3) "the identity of the parent with whom the child has spent most of his or her time pending custody determination if that period has been lengthy," and (4) "the stability of the environment provided by each parent."

■ We believe that the trial court did not consider the appropriate factors in making its determination of what was in the best interests of the children. A review of the findings shows that the court based its conclusion that defendant was the proper custodial parent on the outmoded concept of fault on the part of plaintiff. *Humphreys v. Humphreys*, 520 P.2d 193, 194 (Utah 1974). The findings are neither sufficient nor are they logical in determining the best interests of the children. Rather, they are flavored with bias against divorced women, an urban environment, and women who pursue other than the traditional role of a homemaker. The references to plaintiff's standard of living in Salt Lake City as being "not what it should have been" and a change in her "lifestyle" which was not "in the best interests of the family unit" are conclusory and seem to imply that a nebulous, higher standard should be applied to mothers seeking custody of their children in a divorce action.

■ Our reading of the trial transcript forces a belief that some of the findings of fact can be considered "clearly erroneous." Finding 5B states that the plaintiff's actions "broke" the marriage and they were not justified. This is at odds with finding 3 which states that defendant had treated plaintiff cruelly, both mentally and physically. The trial transcript describes defendant's physical attack on plaintiff which defendant admits caused plaintiff to "crumple and pass out." Defendant also testified that plaintiff complained to him that he was overbearing and trying to control her. Plaintiff testified that on the night she returned home from the hospital after surgery which attempted to correct her infertility, defendant insisted on physical relations against her will. This Court believes that the evidence does support the finding concerning defendant's cruelty.[1] While the findings attempt to excuse or justify defendant's assault on plaintiff, neither this Court nor any other court can excuse or justify or approve intrafamily violence or

---

**1.** Finding 5B, which is totally contradictory to finding 3, although on the same subject, the cause of the marriage breakdown, must therefore be in error and disregarded.

spouse abuse.[2] An assault is equally serious and equally criminal whether committed between family members or between strangers.[3]

Finding 5D states that the trial court was influenced in determining the best interests of the children by plaintiff's involvement with another man. The trial judge does not define that involvement. We are unable to understand how it impacted on the custody award without some specificity in terms or degree. There is no evidence to indicate that plaintiff had been unfaithful to her husband. We assume from the record that the court below was referring to plaintiff's supervisor when "involvement" is charged. Plaintiff admits to having met him in Salt Lake City when she had traveled from Central for a medical consultation and her supervisor, who had been transferred to Logan, was in Salt Lake City on business. She claims nothing untoward occurred during this meeting. Plaintiff also admitted to liking her supervisor but stressed that both he and she were married and she was committed to her marriage. Defendant claims that plaintiff had told him that she loved her supervisor. This is insufficient evidence for a claim of even minimal involvement if we interpret it to mean other than an everyday business relationship between supervisor and employee. It appears logical that plaintiff would speak to a friend concerning a deteriorating marriage but because that friend was male cannot ipso facto indicate involvement of an intimate nature between them.

Finding 5E states that plaintiff's changed lifestyle was pursuant to her desires and for her benefit to the exclusion of the family unit. The transcript reveals that plaintiff was interested in improving her ability to earn a living, particularly in view of the state of her marriage after she returned to work. In addition, she testified that a reduction of the family farm debt was a consideration in her working as was the perceived need to obtain a skill to support the family, if necessary. The latter consideration was fostered by the experience of her mother who was widowed with eight children still in the home. These appear to be rational reasons for self-improvement and the development of skills which could be translated into supporting a family. Furthermore, this Court will not condone any finding of fact which might be interpreted as penalizing a woman for acquiring skills in other than the most fundamental and traditional areas necessary for functioning as a wife and mother.

## DISTRIBUTION OF RETIREMENT ASSET

Utah Code Ann. § 30-3-5 (1984) authorizes the trial court to include equitable orders relating to children, property, and parties in a decree of divorce. The Utah

---

**2.** *See infra* the portion of this opinion which deals with bias on the part of the trial court.

**3.** Intrafamily violence is a very serious problem. most often directed toward women as victims. It is estimated that up to 95% of all spouse abuse is committed by men. Spouse abuse and battering of women, therefore, are nearly synonymous. Battering is defined as any forceful physical or psychological behavior by a man in order to coerce a woman to do what he wants her to do without regard to her rights. *The Battered Woman* XV (1979), Dr. Lenore Walker. According to the *1983 Attorney General Report* by Wm. French Smith, battering is the single major cause of injury to women exceeding rape, muggings and auto accidents.

"In any given year, at least one-tenth to one-fifth of American women are beaten by a man with whom they are intimately involved. This translates into some six million battered women in America each year. One woman in four will suffer abuse during the entire course of a given relationship." Waits, *The Criminal Justice System's Response to Battering: Understanding the Problem, Forging the Solutions,* 60 Wash.L.Rev. 267, 273 (1985).

The most serious aspect of this problem is the proven tendency of family violence to be passed down to successive generations. While children may not be immediate victims, they certainly are the victims and perpetrators of such violence in the future. At least one state has taken statutory notice of the problem. In Florida, courts are required to consider evidence of spouse abuse as evidence of detriment to the parties' children when considering shared responsibility for them. If spouse abuse is found, the court may award sole custody to the abused spouse and may tailor visitation to protect the abused spouse and children. 1984 Fla. Laws 84–152., now Fla.Stat. § 61.13(2) (1985).

Supreme Court discussed this section in *Englert v. Englert*, 576 P.2d 1274, 1276 (Utah 1978), when it wrote:

It is to be particularly noted that that language is in general terms and contains no hint of limitation. The import of our decisions implementing that statute is that proceedings in regard to the family are equitable in a high degree; and that the court may take into consideration all of the pertinent circumstances. It is our opinion that the correct view under our law is that this encompasses all of the assets of every nature possessed by the parties, whenever obtained and from whatever source derived; and that this includes any such pension fund or insurance. These should be given due consideration along with all other assets, income and the earnings and the potential earning capacity of the parties, in determining what is the most practical, just and equitable way to serve the best interests and welfare of the parties and their children (footnote omitted).

■ In the instant case, it appears that the trial court gave due consideration to the entirety of assets possessed by plaintiff and defendant. Considering the lack of an award of alimony, we must conclude that the court below intended the division of defendant's retirement account to be an important item in providing plaintiff with an equitable share of the marital property. We note that defendant is employed by the U.S. Government and can potentially qualify for a pension based on years of service and age. Defendant's situation is substantially similar to that of the husband in *Woodward v. Woodward*, 656 P.2d 431 (Utah 1982), in that both are federal employees; therefore the reasoning in *Woodward* is appropriate here. Specifically, awarding plaintiff approximately one-third of what defendant testified to as the current value of the fund does not recognize its potential value.[4] The trial record fails to establish the particulars of defendant's retirement fund which should have been accomplished. There is no evidence to show whether the U.S. Government will match defendant's contributions upon his retirement as was the case in *Woodward*. This would be deferred compensation and certainly would include monies for the years during which the parties were married. We believe that the trial court erred when dividing this asset and should have applied the formula delineated in *Woodward*. See also *Stephens v. Stephens*, 728 P.2d 991, 992 (Utah 1986); *contra Rayburn v. Rayburn*, 738 P.2d 238 (Utah App. 1987).

The concurring opinion suggests that, to avoid "long lasting financial entanglements" between the parties, defendant's retirement account should be valued and cashed out, if at all possible. Federal retirement, however, presents a different situation. Federal law specifically indicates that a decree of divorce, which provides for a portion of retirement benefits to be paid to an ex-spouse, will be honored. It is necessary to conform to the requirements of 5 U.S.C. § 8345 (1986) and regulations thereunder. Once the delineated procedures have been followed, the monthly retirement payment is divided accordingly between retiree and ex-spouse by the Office of Personnel Management and separate payments are made. There are no direct "financial entanglements" between the couple.

This approach to distributing the retirement asset is particularly desirable when, as here, the asset has a greater future value than the present value. Because of the mechanics of the federal retirement system, an ex-spouse will receive far more than a share of the asset's value at divorce by simply waiting until the retiree is entitled to a monthly payment and then receiving the decreed share of the retirement asset at its greatest value.[5] The decreed

---

4. The testimony as to present value was given by defendant agreeing to a statement by counsel in a leading question. No foundation was offered to define what was meant by "present value" or how it was calculated.

5. In many cases the ex-spouse has no right to receive any retirement payments. By following the suggested procedure, the ex-spouse will receive those benefits, which have been earned during the marriage, at the time they are most needed. This fulfills the purpose of spousal

share should take into consideration the number of years the couple was married during which the employee spouse worked for the federal government and the total number of years the spouse was employed by that entity. In a situation such as the instant case, the court decree could state that plaintiff was entitled to a monthly payment, at the time of defendant's retirement, of one-half of his total monthly payment times the fraction in which the numerator consists of the number of years or months they were married during which defendant was employed by the federal government and the denominator is the total number of years or months defendant was in such employment. It is understood that the fraction cannot be established until defendant actually retires but the establishment of the numerator is the critical determination to be made at the time of divorce. The decree should also provide for the contingencies in which defendant either dies prior to retirement or leaves federal service before becoming eligible for retirement benefits. The first contingency is provided for in 5 U.S.C. § 8341 (1986). In order to provide plaintiff with benefits under the second contingency, the court could include in the decree a prohibition against defendant withdrawing his contribution without plaintiff's written permission and provide for a lump sum payment to plaintiff from the account.

The above is not meant to specifically direct or limit the discretion of the trial court on remand. That court, however, must be aware of the provisions of federal law relating to the division of a retirement asset. The trial court's ten year payout would have been both unfair and would have created immediate "financial entanglements" which caused defendant to make yearly out-of-pocket payments to plaintiff rather than having the federal government accomplish the division pursuant to the decree of divorce.

support described in *Paffel v. Paffel*, 732 P.2d 96, 100 (Utah 1986), "to maintain as nearly as possible the standard of living enjoyed during the marriage and to prevent her from becoming a public charge." It seems grossly unfair to

## PERSONAL INJURY AWARD

■ In *Izatt v. Izatt*, 627 P.2d 49, 51–52 (Utah 1981), the Utah Supreme Court stated that the money received by the wife in settlement of a malpractice suit belongs to her. The Court continued by holding that a portion of the funds from the settlement could be applied to debts necessarily incurred for the support of the family. That same Court, in *Claus v. Claus*, 727 P.2d 184, 185 (Utah 1986), reviewed the case law concerning the division of marital property. We are reminded that there is "no fixed formula" in such a division, it should be "fair, equitable, and necessary for the protection and welfare of the parties," and the trial court findings will not be disturbed "unless the record indicates it abused its discretion." However, the findings of fact concerning the personal injury award are subject to the standards previously stated in this opinion. *Acton*, 737 P.2d at 999. Here, there are no findings concerning the personal injury awards plaintiff received as a result of the automobile accidents she suffered. Defendant testified that he did not know to what extent the settlement awards were used to purchase the family farm. Although the findings as to the property division are more numerous than on other issues, they still are insufficient to show the use and distribution of plaintiff's personal injury awards.

## INTEREST

■ The decree indicates that any deficiency in what is actually received from the sale of the family farm and what is to be paid to plaintiff relative to the property division, accrues interest at a rate of 8% per annum. Utah Code Ann. § 15-1-4 (1986) requires that judgments, other than those based on a contract in which interest has been agreed upon by the parties, "shall bear interest at the rate of 12% per annum." This Court, in *Stroud v. Stroud*, 738 P.2d 649 (Utah App.1987), held that the

reward the principal wage earner and to penalize the ex-spouse by making an award which insures retirement income to the wage earner and potential poverty to the ex-spouse.

statutory rate of interest was the minimum interest allowable on child support arrearages. We stated that the specific language of § 15-1-4 applies to the provisions of Utah Code Ann. § 30-3-5(1) (1984) whereby the trial court enters orders "in relation to the children, property and parties...." Therefore, we hold that the trial judge erred in not awarding interest on the property award in an amount of 12% per annum.[6] As previously stated, plaintiff's award of defendant's retirement fund was to accrue interest at 8% per annum. If the award had been correct, it too should have accrued interest at the statutory rate.

## ALIMONY AWARD

■ In the findings of fact, finding 8 disallows alimony to plaintiff without explanation while finding 10 sets forth the net monthly incomes of the individual parties. In *Eames v. Eames*, 735 P.2d 395, 397 (Utah App.1987), we cited *Paffel v. Paffel*, 732 P.2d 96, 100 (Utah 1986), for the standard of appellate review concerning an award of alimony and listed the factors the trial court must consider to avoid a challenge to the award as being an abuse of discretion. We further stress what our Supreme Court has stated to be the purpose of spousal support: to enable plaintiff to maintain as nearly as possible the standard of living enjoyed during the marriage and to prevent her from becoming a public charge. *Id.* The findings of fact and the trial record in the instant case are insufficient to establish plaintiff's financial condition and needs, her ability to provide sufficient income for these needs, and defendant's ability to provide support. We do not intend to imply that plaintiff should or should not receive alimony. That determination is to be made by the trier of fact and must be supported by adequate findings of fact.

## BIAS

■ In both the docketing statement filed on appeal and in her appellate briefs, plaintiff alleges bias on the part of the trial court because she exercised her right to seek a divorce. The written findings of fact and the judge's oral findings and rulings at the conclusion of the trial contain statements which raise this issue. At pages 130-31 of the trial transcript, the judge stated:

> I'll be honest. I have difficulty with what the Plaintiff sues, alleges grounds. I have difficulty finding where this Defendant's done anything wrong, other than slapping her. Maybe that was justified. I don't believe in it. I don't believe anyone should use force and violence. But I'm having difficulty. However, under the circumstances I don't see where I can force them to live together. So based on that I'm going to find that the Defendant did treat the Plaintiff cruelly, causing her physical and mental anguish, physical anguish because he struck her on the one occasion when he was what appeared to me highly provoked.

This Court cannot accept any rationale for the trial court's comment concerning defendant's lack of fault "other than slapping her" which occurred when he was "what appeared to me highly provoked." We have previously offered our opinion concerning this all too common expression of an inability to deal with a differing point of view. We see little reason why the trial court's findings of fact refer to plaintiff's moving into an apartment with "another woman who is divorced" or the nonspecific comment as to plaintiff's lifestyle. However, we stress that the issue of bias was not brought up in the court below pursuant to Utah R. Civ. P. 63(b). This issue arises, in our minds, through the judge's comments and rulings at trial. We offer the general philosophy expressed in *Haslam v. Morrison*, 113 Utah 14, 190 P.2d 520, 523

---

**6.** It should also be noted that although the farm was ordered to be sold by June 18, 1987, no penalty or incentive to sell was ordered. If defendant fails to sell, plaintiff receives nothing from the property and interest on her award does not accrue. Plaintiff is thus left with an award of $600 per year for 10 years with interest at 8% per annum pursuant to the retirement distribution and other amounts due to her in accordance with other provisions of the Decree of Divorce.

(1948), noting that an affidavit of bias and prejudice is treated differently today than it was in 1948. Justice Wolfe, writing for the Court, stated:

> The purity and integrity of the judicial process ought to be protected against any taint of suspicion to the end that the public and litigants may have the highest confidence in the integrity and fairness of the courts.

Justice Wade in a concurring opinion stressed this point when he wrote:

> One of the most important things in government is that all persons subject to its jurisdiction shall always be able to obtain a fair and impartial trial in all matters of litigation in its courts. It is nearly as important that the people have absolute confidence in the integrity of the courts. I can think of nothing that would as surely bring the courts into disrepute as for a judge to insist on trying a case where one of the litigants believes that such judge is biased and prejudiced against him.

*Id.* 190 P.2d at 526.

We reverse and remand for a new trial on all issues excluding the granting of the divorce, which is affirmed. Costs against defendant.

GARFF, J., concurs.

ORME, Judge (concurring):

I concur fully in most of the main opinion. As to the discussion under the headings "Distribution of Retirement Asset"

and "Interest," I have a somewhat different view, although I agree remand and reconsideration are appropriate. I wish also to add a comment concerning the discussion under the heading "Custody Award."

### DISTRIBUTION OF RETIREMENT ASSET

As I read *Woodward v. Woodward,* 656 P.2d 431 (Utah 1982), one spouse's interest in the other's pension benefits should be cashed out immediately, if at all possible. Deferred participation, as upheld in *Woodward,* is to be avoided. *See Woodward* at 433 (quoting *Kikkert v. Kikkert,* 177 N.J. Super. 471, 427 A.2d 76, 79–80 (1981)). *See also Rayburn v. Rayburn,* 738 P.2d 238, 241–42 (Utah Ct.App.1987) (cash-out of retirement fund share appropriate to avoid long lasting financial entanglement of parties).

While I agree that a new trial must be held and all pertinent issues reconsidered,[1] I do not agree with my colleagues that the "formula delineated in *Woodward*" should necessarily govern the trial court's treatment of the retirement fund on remand. If "other assets available for equitable distribution" are adequate, 656 P.2d at 433, and if, with expert or other evidence, a "present value can be established,"[2] *id.,* then, under *Woodward,* Mrs. Marchant's share of the retirement fund should be fixed and paid or otherwise settled. *Id.* Only if these two factors are not present should a deferred arrangement be prescribed.[3]

1. I note that any failure of the record to include what the main opinion refers to as "the particulars of defendant's retirement fund" and "evidence to show whether the U.S. Government will match defendant's contributions" is ultimately the responsibility of plaintiff, who was free to take discovery and assemble evidence on these points. Without such evidence in the record, and with unobjected to testimony as to the asset's value, the trial court did not err in finding the value of the asset to be as testified by the husband.

2. The present value would not necessarily be the cash value of then-vested benefits. In a case like this one, the "present value" should measure the present worth of ultimate retirement benefits insofar as attributable to employment during the marriage in question.

3. "Long term and deferred sharing of financial interests are obviously too susceptible to continued strife and hostility, circumstances which our courts traditionally strive to avoid to the greatest extent possible. This goal may be best accomplished, if a present value of the pension plan is ascertainable, by fixing the other spouse's share thereof, as adjusted for all appropriate considerations, including the length of time the pensioner must survive to enjoy its benefits, to be satisfied out of other assets leaving all pension benefits to the employee himself." *Woodward v. Woodward,* 656 P.2d at 433 (quoting *Kikkert v. Kikkert,* 427 A.2d at 79–80).

I agree with the main opinion that the ten-year payout prescribed by the trial court posed an unacceptable long-term financial entanglement at odds with the sound policy recognized

## INTEREST

As to the question of interest, the main opinion adheres to this court's recent opinion in *Stroud v. Stroud*, 738 P.2d 649 (Utah Ct.App.1987), in which this court concluded that there may be no deviation from the statutory judgment interest rate even in divorce actions. I adhere to the view taken in the *Stroud* dissent, *id.* at 651–52 (Greenwood, J., dissenting), and therefore do not agree it was necessarily error to have provided for less than a 12% rate of interest on certain elements of the property award. In my view, however, there needs to be an articulated, rational basis for deviating from the statutorily prescribed rate.

Thus, while I agree error was committed, I find error not because an interest rate of less than 12% was imposed, but only because the basis for such a rate was not articulated and substantiated.

in *Woodward.* If on remand the true present value of the marital portion of the retirement fund can be fixed, deferred participation would nonetheless be appropriate under *Woodward* if other assets are not available with which to cash out Mrs. Marchant. *See* 656 P.2d at 433. If such assets exist, deferral should be avoided.

## CUSTODY AWARD

Although, as indicated, I concur in the section of the main opinion entitled "Custody Award," I wish to add a further comment. As the main opinion states, the record does not show that "plaintiff had been unfaithful to her husband" or that she had other than "minimal involvement" with her supervisor. However, even if the evidence were otherwise, such facts would not be controlling. "Moral character is only one of a myriad of factors the court may properly consider in determining a child's best interests." *Sanderson v. Tryon*, 739 P.2d 623, 627 (Utah 1987).

While federal regulations may minimize the concern about long-term financial entanglement, immediate cash-out is still preferable, in my judgment, where feasible.