**Cheri Lynne TUCKER, Plaintiff and Appellant,**

v.

**James Calvin TUCKER, Defendant and Appellee.**

**No. 930380–CA.**

Court of Appeals of Utah.

Sept. 6, 1994.

Suzanne Marelius (argued), Littlefield & Peterson, Salt Lake City, for appellant.

Mary C. Corporon (argued), Corporon & Williams, P.C., Salt Lake City, for appellee.

Before BILLINGS, DAVIS and GREENWOOD, JJ.

## OPINION

GREENWOOD, Judge.

Appellant Cheri Lynne Tucker appeals that portion of the trial court's divorce de-

cree that awarded physical custody of the couple's four-year-old daughter to appellee James Calvin Tucker. We remand for further detailed findings on the issue of physical custody.

## BACKGROUND

Jim and Lynne Tucker were married on February 26, 1988. The parties' only child, Jessica Tucker, was born approximately ten months later. Three and one-half years after their marriage, Jim and Lynne separated amicably. Both parties agreed initially that Lynne should have physical custody of Jessica, with Jim enjoying liberal visitation privileges. When Lynne later filed for divorce, the trial court allowed a continuation of this arrangement, awarding Lynne temporary custody of Jessica and Jim liberal visitation privileges. Consequently, Jessica lived with her mother Lynne for eighteen months under this arrangement, until the matter came to trial. At trial, Jim testified that he agreed to this initial custody arrangement because he believed that Lynne, who was experiencing depression and stress, would eventually give him custody of Jessica. Additionally, Jim testified that he believed Lynne might take Jessica away if he contested the issue of physical custody.

Shortly after the parties separated, Jim received an anonymous phone call telling him that he should be concerned about Jessica because of Lynne's "lifestyle." Jim confronted Lynne about her "lifestyle" and Lynne stated that she could not guarantee that she would not have a relationship with another woman.[1] In fact, sometime after this conversation and for almost one year before trial, Lynne entered into a monogamous lesbian relationship. Lynne and her companion, along with Jessica, lived together for a time at the home of Lynne's mother, Carol Birch. Shortly before trial, Lynne and her companion bought a house together in the Rose Park area of Salt Lake City.

At trial, the principal issue was custody of Jessica. Dr. Monica Christy, a witness at trial, performed a custody evaluation, which included evaluations of both Jim and Lynne for the purpose of making a custody recommendation for Jessica. Dr. Christy interviewed Jim and Lynne for approximately three hours each. She also conducted a series of psychological tests for three additional hours. In addition, both Jim and Lynne completed questionnaires for Dr. Christy regarding their educational and occupational backgrounds, residential history, and parenting skills, as well as a child care list on which they indicated the amount and type of their respective participation in Jessica's care. Further, Dr. Christy spoke with Lynne's mother, Carol Birch, and to Donna Steadman, Jessica's former daycare teacher. Finally, Dr. Christy reviewed letters submitted by friends, neighbors, and family members, and conducted a home visit at both Jim's and Lynne's homes where she observed each with Jessica. In her custody evaluation report, Dr. Christy recommended, although she admitted it was a close call, that Jim be given sole physical custody of Jessica because, in the long run, he would provide a more stable environment for her. Of principal concern to Dr. Christy was Lynne's history of mood swings and emotional instability, although there was some evidence introduced at trial that Lynne had progressed significantly after undergoing therapy and taking medication to correct her depression and mood swings.

After receiving a copy of Dr. Christy's custody evaluation, Lynne retained Dr. Donald Strassberg, a professor of psychology at the University of Utah, to review Dr. Christy's report. Dr. Strassberg interviewed Lynne for five hours, performed a ninety-minute home visit with Lynne and Jessica, conducted his own psychological test, and spoke with Lynne's therapist, Jodie Leslie. Dr. Strassberg did not, however, interview or evaluate Jim. Dr. Strassberg criticized Dr. Christy's report as "over-pathologizing" Lynne. Dr. Strassberg discounted Dr. Christy's concerns about Lynne's mood swings stating that what she had or was experiencing was within normal ranges. Dr. Strassberg did admit that Lynne had been

---

1. Lynne had apparently admitted to Jim before they were married that she had previously been

intimately involved with other women.

depressed during her marriage and had exhibited mood swings. He thought, however, that her successful therapy and her year-long monogamous lesbian relationship showed a leveling-out of the mood swings and a coming-to-terms by Lynne with her sexuality.

The trial court, ultimately placing more weight on Dr. Christy's evaluation report because she had interviewed and evaluated both Jim and Lynne, ruled that Jim and Lynne should have joint legal custody but that Jim should be awarded sole physical custody of Jessica with Lynne to enjoy liberal visitation privileges. Because our evaluation of the trial court's ruling hinges upon the adequacy of its written findings, we set out below the trial court's findings of fact relevant to the custody issue:

22. The court finds that the issue of greatest concern to both parties to this action is the issue of child custody. It is reasonable, just and proper, and is in the best interest of the minor child, that the defendant be awarded the permanent physical care, custody, and control of the child, subject to plaintiff's reasonable and liberal rights of visitation as defined below. In support of this finding regarding custody, the court makes the following specific findings:

a. A child custody evaluation was conducted herein by Dr. Monica Christy, who was the only independent evaluator who assessed both parties to testify at the time of trial, regarding the issue of custody. Dr. Monica Christy recommended that the defendant have custody of the parties' minor child. An evaluation was conducted herein by Dr. Donald Strassberg, who assessed the plaintiff and the parties' child, but did not assess the defendant. Dr. Strassberg found that plaintiff was a fit and appropriate parent and that custody should be awarded to plaintiff. The court finds that it should rely on the recommendation of Dr. Monica Christy and should not accept the recommendation of Dr. Donald Strassberg;

b. The minor child is now four years of age and is not yet attending school. The plaintiff has had the temporary care, custody and control of the minor child during the pendency of these divorce proceedings, at first by reason of the parties' conduct, and then pursuant to temporary order of this court, and this condition has existed since approximately July 1, 1991;

c. The court finds that a change in custody of the minor child from the plaintiff to the defendant will not be substantially traumatic to the minor child because of her age, general condition of health and wellbeing as testified to by Dr. Monica Christy, and Dr. Donald Strassberg, the level of bonding to her father, and the circumstances of the parties. The court finds that in the long run, any trauma caused by a change in the custody arrangement will be temporary and will be off-set by a long term advantage to the minor child of living with her father;

d. The court finds that the minor child has a stronger bonding to her father, based upon the testimony of the minor child's day care provider. The court finds that the minor child is also closely bonded to her mother;

e. The court finds that there is a history of emotional instability on the part of the plaintiff. The court finds that there has been substantial progress made by the plaintiff during the separation of the parties, in personal therapy and treatment, and the court commends her for this progress, but the court finds that the father is still significantly more stable;

f. The court finds that the issue of the minor child's preference is moot, for the reason that the minor child has expressed no preference, and the child is of such tender years that any preference expressed would be irrelevant;

g. The minor child has no siblings, half-blood sibling, nor step-siblings. Therefore, a consideration of the status of her siblings is not relevant in this action;

h. The court finds that the defendant is able to spend a bit more time providing personal care for the minor child then [sic] is the plaintiff;

i. The court finds that the child's church functions and activities are important personally to the child. The court finds that there is more religious compati-

bility between the defendant and the minor child, and that the defendant is more likely to foster a continued involvement of the minor child in the church activities in which she has previously participated than is the plaintiff;

j. The court finds that, because of moral issues presented in this case, the defendant is a more fit parent to exercise custody of the minor child than is the plaintiff. Specifically, the court analyzes the circumstances of the plaintiff as follows:

i. The plaintiff and other witnesses have testified to the status of the plaintiff as a lesbian or bisexual individual who is currently involved in a monogamous intimate relationship, that amounts to cohabitation, with another woman. Specifically, plaintiff and her female companion have purchased a home together and cohabited together for a period of approximately five months prior to trial, first in the home of plaintiff's parents, then in their own home, prior to the trial;

ii. The court finds that the status of the plaintiff as a lesbian or bisexual does not bear directly on her parenting abilities, and the court finds that she should not be deprived of custody of her minor child based upon her sexual preference. Both Dr. Monica Christy and Dr. Donald Strassburg [sic] testified that homosexuality is not a mental illness nor a deviancy, and the court adopts this finding;

iii. The plaintiff has chosen to act out her sexual preference by conducting a relationship with a woman companion involving cohabitation without benefit of marriage in the same home with the minor child. The court finds that this can be analyzed and should be analyzed similarly to a situation involving cohabitation with a member of the opposite sex without benefit of marriage in the presence of a minor child. The court finds that this conduct on the part of the plaintiff during the pendency of this action and prior to the custody trial in this matter demonstrates a lack of moral example to the child and a lack of moral fitness. This conduct is unlawful in the State of Utah; and,

k. The plaintiff's companion was not a witness at trial nor evaluated by any expert witness as to her fitness to act in the role of step-parent to the child.

Ms. Tucker now appeals the trial court's custody ruling.

## ISSUES

Ms. Tucker proposes four grounds for reversing the trial court's custody ruling: (1) it abused its discretion by ordering a change of custody; (2) it showed bias against homosexual parents; (3) it made erroneous findings in the custody decision; and (4) it failed to make adequate findings to support its custody decision. As we remand to the trial court for further detailed findings on the issue of physical custody of Jessica, we do not reach Ms. Tucker's other arguments.

## STANDARD OF REVIEW

"Trial courts are given broad discretion in making child custody awards." *Sukin v. Sukin,* 842 P.2d 922, 923 (Utah App.1992). "The trial court's decision regarding custody will not be upset 'absent a showing of an abuse of discretion or manifest injustice.'" *Id.* (quoting *Maughan v. Maughan,* 770 P.2d 156, 159 (Utah App.1989)). "We give great deference to the trial court's findings of fact and do not overturn them unless they are clearly erroneous." *Riche v. Riche,* 784 P.2d 465, 467 (Utah App.1989). "'However, to ensure the court acted within its broad discretion, the facts and reasons for the court's decision must be set forth fully in appropriate findings and conclusions.'" *Sukin,* 842 P.2d at 923–24 (quoting *Painter v. Painter,* 752 P.2d 907, 909 (Utah App.1988)).

## ANALYSIS

### Adequacy of Trial Court's Findings

■ Ms. Tucker argues that the trial court's findings are inadequate to support its ultimate award of custody to Mr. Tucker.[2]

---

2. On a related point, Ms. Tucker asserts that the trial court erred by failing to consider other relevant factors in assessing the proper award of custody. The law is clear, however, that there "is no definitive checklist of factors to be used for determining custody since such 'factors are

This court has stated on numerous occasions that a trial court's findings will be deemed inadequate, and the case subject to reversal or remand, unless the trial court

> "set[s] forth in its findings of fact not only that it finds one parent to be the better person to care for the child, but also the basic facts which show *why* that ultimate conclusion is justified. There must be a 'logical and legal basis for the ultimate conclusions.'"

*Sukin v. Sukin,* 842 P.2d 922, 924 (Utah App.1992) (quoting *Smith v. Smith,* 726 P.2d 423, 426 (Utah 1986) (quoting *Milne Truck Lines v. Public Serv. Comm'n,* 720 P.2d 1373, 1378 (Utah 1986))). The *Sukin* court also stated that

> "[t]he importance of complete, accurate and consistent findings of fact in a case tried by a judge is essential to the resolution of dispute under the proper rule of law. To that end the findings should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached.'"

*Id.* (quoting *Smith,* 726 P.2d at 426 (quoting *Rucker v. Dalton,* 598 P.2d 1336, 1338 (Utah 1979)); *accord Barnes v. Barnes,* 857 P.2d 257, 259–60 (Utah App.1993); *Roberts v. Roberts,* 835 P.2d 193, 195–96 (Utah App. 1992).

Ms. Tucker assails as inadequate five of the trial court's findings. She argues that they "show a misapplication of current law to the custody issue" and are not supported by evidence in the record. The findings with which Ms. Tucker takes issue are:

1. There is more bonding between the child and the father;

2. The husband may be able to spend a bit more time with the child;

3. There was more religious compatibility with the father than with the mother;

4. There is a history of emotional instability on the part of the Plaintiff; and

5. Plaintiff's cohabitation with another woman "demonstrates a lack of moral example to the child and a lack of moral fitness."

Although the trial court apparently based its decision on all of its findings, the two findings regarding Ms. Tucker's history of emotional instability and her cohabitation with another woman seem to predominate.[3]

---

highly personal and individual, and do not lend themselves to the means of generalization employed in other areas of the law.'" *Sukin v. Sukin,* 842 P.2d 922, 924 (Utah App.1992) (quoting *Moon v. Moon,* 790 P.2d 52, 54 (Utah App. 1990)).

In an effort to aid trial courts charged with determining the best interests of a child, the Utah Supreme Court listed several factors that a trial court should consider, and where applicable, make appropriate findings on them:

> [T]he preference of the child; keeping siblings together; the relative strength of the child's bond with one or both of the prospective custodians; and in appropriate cases, the general interest in continuing previously determined custody arrangements where the child is happy and well adjusted.

*Hutchison v. Hutchison,* 649 P.2d 38, 41 (Utah 1982). Furthermore, the *Hutchison* court indicated that a trial court should also consider, where applicable, factors relating to the prospective custodians of the child:

> [M]oral character and emotional stability; duration and depth of desire for custody; ability to provide personal rather than surrogate care; significant impairment of ability to function as a parent through drug abuse, excessive drinking, or other cause; reasons for having relinquished custody in the past; religious compati-

bility with the child; kinship, including, in extraordinary circumstances, stepparent status; and financial condition.

*Id.* While these factors are helpful, if applicable, *Sukin* and other cases have clearly stated that a trial court is not required to consider all the factors listed by the *Hutchison* court. *See Sukin,* 842 P.2d at 924.

3. As we reverse and remand for additional findings on these two findings, we address the trial court's other three findings highlighted by Ms. Tucker—time available to spend with the child, parent to whom the child is most bonded, and religious compatibility—only to note that they are supported by skimpy record evidence at best. The record clearly shows that both parents are bonded to their daughter, that they both have roughly the same number of hours each week to spend with Jessica, and that both parents have expressed a willingness to allow Jessica to continue participating in LDS primary. We believe that these three findings barely tip, if at all, the scales in this case. The underlying facts for all three findings are superficial and hardly persuasive enough to disrupt a successful 18–month-long temporary custody arrangement. *See Paryzek v. Paryzek,* 776 P.2d 78, 81 (Utah App.1989) ("There is a 'general interest in continuing previously determined custody arrangements where

"[W]hen custody is contested and evidence presents several possible interpretations, . . . [w]e must have the necessary supporting factual findings linking those factors to the children's best interests and each parent's abilities to meet the children's needs." *Roberts*, 835 P.2d at 196; *see also Painter v. Painter*, 752 P.2d 907, 909 (Utah App.1988) (indicating court must consider needs of child and ability of parents to meet those needs). In *Roberts*, the trial court found that "both parties ha[d] participated in acts that bear on their moral character." *Roberts*, 835 P.2d at 196. On appeal, this court remanded the trial court's custody award for more detailed findings because the trial court's statement regarding moral character gave "no guidance regarding how those acts bear on the parties' parenting abilities or affect the children's best interests." *Id.* at 197.

In the instant case, the trial court has likewise supported its decision with inadequate findings. Although the trial court cited Ms. Tucker's emotional instability and her cohabitation with another woman as reasons for awarding permanent custody to Mr. Tucker, its findings on these two critical areas fail to give "guidance regarding how those acts bear on [Ms. Tucker's] parenting abilities or affect the [child's] best interests." *Id.* Specifically, although the trial court noted that Ms. Tucker has a history of emotional instability and that she had made good progress in overcoming that problem, the trial court failed to indicate how this problem affected, if at all, Ms. Tucker's ability to adequately meet the needs of her daughter. Instead, it simply made the finding, unsupported by the necessary subsidiary facts, that "the father is still significantly more stable."

Opposing the trial court's finding on this issue of emotional stability is the fact that Ms. Tucker has had temporary custody of Jessica, pending the divorce proceedings, for over eighteen months. The trial court entered no finding that Ms. Tucker's emotional instability rendered her an ineffective parent during the eighteen months of temporary custody. Rather, the record clearly shows that the trial court, Mr. Tucker, and both experts all acknowledged that Jessica was thriving in her mother's care during this eighteen-month-long period of temporary custody.[4] Accordingly, the trial court's find-

---

the child is happy and well adjusted.' " (quoting *Hutchison*, 649 P.2d at 41)). On remand, the trial court should either further support these three findings or regard them as neutral.

4. We believe the trial court should have more thoroughly considered the impact on Jessica's best interest of uprooting her from an environment in which she had been thriving for 18 months. As stated by the Utah Supreme Court,

[I]f an existing custody arrangement is not inimical to the child, the continuity and stability of the arrangement are factors to be weighed in determining a child's best interests. What particular weight to be accorded those factors in a given case must depend on the duration of the initial custody arrangement, the age of the child, the nature of the relationship that has developed between the child and the custodial and noncustodial parents, and how well the child is thriving physically, mentally, and emotionally. A very short custody arrangement of a few months, even if nurturing to some extent, is not entitled to as much weight as a similar arrangement of substantial duration.

*Elmer v. Elmer*, 776 P.2d 599, 604 (Utah 1989). Furthermore, the *Elmer* court emphasized that "a lengthy custody arrangement in which a child has thrived ought rarely, if at all, to be disturbed, and then only if the circumstances are compelling." *Id.* Although the *Elmer* court was not

dealing with a temporary custody arrangement, this court, citing *Elmer*, noted in an appeal of an original custody award changing a 30-month-long temporary custody arrangement that the "paramount consideration must be promoting the child's best interests, and it is irrelevant from the child's perspective, how, as a legal matter, the existing arrangement came about." *Paryzek*, 776 P.2d at 82.

The Utah Supreme Court has held in other cases that "stability is a fundamental consideration in original custody awards as well as in subsequent modifications." *Id.* For example, in *Pusey v. Pusey*, 728 P.2d 117 (Utah 1986), the supreme court stated that one factor to consider is the "identity of the parent with whom the child has spent most of his or her time pending custody determination if that period has been lengthy." *Id.* at 120; *accord Marchant v. Marchant*, 743 P.2d 199, 203 (Utah App.1987). In another case, the supreme court noted that "[i]n considering competing claims to custody between fit parents under the 'best interests of the child' standard, considerable weight should be given to which parent has been the child's primary caregiver" prior to the divorce. *Davis v. Davis*, 749 P.2d 647, 648 (Utah 1988).

While we have not reached Ms. Tucker's abuse-of-discretion argument, we note, without holding, that the trial court may have disregarded Jessica's best interests, and consequently

ings on this issue are inadequate because they fail to identify those subsidiary facts that support the trial court's conclusion that Mr. Tucker is "significantly more stable." Furthermore, we believe that adequate findings must address the fact that Jessica has been living with her mother in an apparently stable and nurturing environment for eighteen months prior to the trial court's award of permanent custody.[5]

Next, the trial court's finding that Ms. Tucker was morally unfit to be the custodial parent because she was cohabitating with another woman is likewise inadequate. Utah courts have previously noted that a custodial parent's censurable extra-marital sexual activities do not in and of themselves make him or her an unfit and improper person to have custody. *See Fontenot v. Fontenot,* 714 P.2d 1131, 1132–33 (Utah 1986); *Shioji v. Shioji,* 671 P.2d 135, 138 (Utah 1983) (Durham, J., concurring and dissenting); *Nielsen v. Nielsen,* 620 P.2d 511, 514 (Utah 1980) (Hall, C.J., dissenting); *Kallas v. Kallas,* 614 P.2d 641, 645 (Utah 1980); *Stuber v. Stuber,* 121 Utah 632, 637, 244 P.2d

650, 652 (1952). The parent's activities must be shown to run contrary to the child's best interests. While this court has found open cohabitation of a parent to be a relevant factor, when combined with others, for affirming a trial court's award of custody to the other parent, *see, e.g., Erwin v. Erwin,* 773 P.2d 847, 849 (Utah App.1989),[6] the trial court must link the parent's cohabitation with a resulting inability to function adequately as the custodial parent and meet the child's needs.

In the present case, the trial court failed to make this critical link. Although finding that Ms. Tucker's open cohabitation demonstrated a "lack of moral example to the child and a lack of moral fitness," the trial court did not link this finding with Ms. Tucker's ability to function as a nurturing and supportive custodial parent. The fact that Ms. Tucker was participating in a monogamous, lesbian relationship does not per se render her unable to provide the necessary care, support, and guidance that her daughter requires, and that Ms. Tucker seemed to

---

abused its discretion, in awarding permanent custody to Mr. Tucker where Jessica had, according to the testimony of both experts, Mr. Tucker, and the finding of the trial court, been thriving in her temporary custody arrangement with Ms. Tucker. The trial court did make a finding that a change in custody would not be "substantially traumatic" to Jessica and that any trauma caused by the change would be "off-set by a long term advantage to [Jessica] of living with her father." The trial court's finding on this issue is conclusory at best, particularly in light of both experts' testimony that the question of custody is a very "close call," and fails to state any subsidiary facts supporting its decision that removing Jessica from an environment in which she has been thriving for 18 months is in her best interest.

This court has reversed a trial court's award of permanent custody that differed from a lengthy period of temporary custody because the trial court failed to properly consider stability as a factor. *Paryzek,* 776 P.2d at 81. In *Paryzek,* we stated that "providing a stable home for a child and avoiding 'ping pong' custody awards are critical factors in custody disputes." *Id.* (quoting *Hogge v. Hogge,* 649 P.2d 51, 53–54 (Utah 1982)). Furthermore, we noted the " 'general interest in continuing previously determined custody arrangement where the child is happy and well adjusted.' " *Id.* (quoting *Hutchison,* 649 P.2d at 41). On remand, we believe the trial court should, given the apparent ability of either par-

ent to care satisfactorily for Jessica, reconsider the appropriateness of removing Jessica from an apparently stable and nurturing environment.

5. While our decision may seem unfair in that the parent awarded temporary custody by the court may be given a slight advantage in some cases if the period of temporary custody has been lengthy, the focus of a court, whether it be trial or appellate, must be on the best interests of the child rather than on the best interest of the divorcing parents. *See* Utah Code Ann. § 30–3–10 (1989).

6. In passing, we note one troubling facet of the trial court's analogy between cohabitating heterosexual and homosexual couples—under Utah law, homosexual couples, unlike heterosexual couples, cannot be married even if they so desire. Hence, it is unclear whether the trial court's finding that Ms. Tucker demonstrated a "lack of moral example" and a "lack of moral fitness" because she was cohabitating with another woman without the benefit of marriage can be properly analogized to a heterosexual, cohabitating couple. The unlawful cohabitation may be the natural result of Utah's law prohibiting same-sex marriages rather than a desire by Ms. Tucker to cohabit without the benefit of marriage. *Cf. Sanderson v. Tryon,* 739 P.2d 623, 627 (Utah 1987) (holding that parent's practice of polygamy "is alone insufficient to support a custody award or to permit meaningful review on appeal").

be providing to her daughter during the eighteen months of temporary custody. Accordingly, we believe that the trial court's findings are inadequate to support its award of custody to Mr. Tucker.

## CONCLUSION

The trial court's findings of fact are inadequate to support its award of physical custody to Mr. Tucker. Accordingly, we reverse and remand for further detailed findings on this issue, consistent with the principles set forth in our opinion.

BILLINGS and DAVIS, JJ., concur.