**Karen C. MARTINEZ, Plaintiff
and Appellant,**

**v.**

**Jess M. MARTINEZ, Defendant
and Respondent.**

No. 860159–CA.

Court of Appeals of Utah.

April 19, 1988.

Neil C. Crist (argued), for Hansen, Crist & Spratley, Bountiful, for plaintiff and appellant.

Yasemin M. Salahor, Paul H. Liapis, Kent M. Kasting (argued), Salt Lake City, for defendant and respondent.

Before JACKSON, BILLINGS and DAVIDSON, JJ.

## OPINION

DAVIDSON, Judge:

Plaintiff appeals from a decree of divorce entered by the Second District Court. We affirm in part, reverse in part, and remand.

## FACTS

The parties were married on June 22, 1968; subsequently, three children were born. At the time of marriage, both plaintiff and defendant were high school graduates and defendant was serving as an enlisted man in the U.S. Army. After defendant's discharge from the service, he accepted employment at Hill Air Force Base, Utah where he worked as an instrument repair mechanic with an annual gross salary of approximately $10,000.00. Defendant began his higher education in 1970. Defendant testified the parties discussed his pursuit of a degree and that plaintiff thought it was a "good idea" but that she "wasn't terribly in favor of it" because it would be time consuming. Plaintiff testified she was in favor of the decision because the family would "have a better future." Defendant completed his undergraduate program five and one-half years later. During this phase of his education, defendant supported the family on his wages and G.I. Bill benefits. Plaintiff gave birth to children in 1970, 1971, and 1975.

While an undergraduate, defendant decided to apply to medical school. The parties agree that defendant's application to medical school threatened their marriage. Plaintiff was concerned that defendant's lack of employment during four years

would be financially detrimental to the family and that medical school would severely limit defendant's ability to "spend much time" with the children and plaintiff. Seeing that defendant was adamant, plaintiff agreed to "stick by him" during the next four years believing that, as a result of their mutual sacrifices, the family would eventually enjoy a higher standard of living.

Defendant entered medical school in 1977 and graduated in 1981. Family support was derived from student loans, savings, the remainder of defendant's G.I. Bill entitlement, $7,000.00 from defendant's mother's estate, and income from plaintiff's part-time employment.

Upon completion of medical school, defendant accepted an internship in Pennsylvania. Plaintiff reluctantly left Utah. The family's first residence in Pennsylvania was in an isolated location with no telephone and no playmates for the children. The family then rented a home in a larger town and plaintiff sought employment to supplement defendant's salary as an intern. Plaintiff testified that she found a position at a fast food restaurant but defendant did not want her to work there because it would be embarrassing. Because of the friction between the parties and defendant's admitted relationship with another woman, plaintiff requested they seek marital counseling but defendant refused. Because of plaintiff's lack of prospects for suitable employment in Pennsylvania and the marital discord, plaintiff and the children returned to the family home in Utah to wait for defendant to finish his medical training. Although plaintiff understood defendant intended to practice medicine in Utah, defendant completed his training and accepted employment in Pennsylvania.

Plaintiff filed a verified complaint for divorce on February 15, 1983. In a stipulation and separation agreement, signed by the parties and filed with the court on July 29, 1983, plaintiff agreed defendant could claim federal tax exemptions for two of the children while she retained the exemption for the third child. The settlement agreement also recognized the need to "make appropriate adjustments" in the support agreement in the event of future changes in financial circumstances.

After plaintiff hired new counsel, she filed a verified amended complaint in November 1983, in which the distribution of the tax exemptions remained the same. On May 9, 1985, however, plaintiff filed a motion for leave to amend the complaint which was subsequently granted. This amendment listed defendant's salary as $100,000.00 per annum and requested that the child support and alimony awards reflect the significant increase in defendant's income. Plaintiff requested attorney fees and costs which would reflect the current state of the litigation as opposed to that anticipated in 1983. Plaintiff also requested the trial court to strike the previously proposed distribution of federal tax exemptions for the children.

Trial to the court was held on May 31, 1985. The decree of divorce awarded custody of the children to plaintiff subject to reasonable visitation. Plaintiff received $300.00 per month per child in child support subject to an abatement of $100.00 per month per child in the event that a child should live with defendant for an extended period. The distribution of tax exemptions was as initially agreed in the stipulation and separation settlement. Alimony was awarded in the amount of $400.00 per month for a period of five years being nonterminable for a period of three years even if plaintiff remarried. Plaintiff was awarded attorney fees in the amount of $2,500.00. Plaintiff was also awarded the home subject to a mortgage and an equitable lien in favor of defendant for the sum of $17,528.00 payable upon the occurrence of enumerated, future contingencies. The award of the home to plaintiff necessitated that she continue to make monthly mortgage payments of $309.00.

Plaintiff presents the following issues for review: (1) did the award to defendant of the two tax exemptions violate federal law; (2) were the awards of attorney fees, child support, and alimony so inadequate as to constitute an abuse of discretion; and (3)

is defendant's medical degree marital property subject to division?

## DISTRIBUTION OF INCOME TAX EXEMPTIONS

Plaintiff contends the distribution of state and federal income tax exemptions for two of the children to defendant violates the Supremacy Clause of the U.S. Constitution in light of the 1984 Tax Reform Act and its effect on 26 U.S.C. § 152(e) (1988).[1]

Subsection 152(e)(1) describes the normal situation where a custodial parent claims the tax exemption for a child. An exception is provided in subsection 152(e)(4)(A). The noncustodial parent may claim the exemption when there is a qualified pre–1985 instrument between the parents which states that the noncustodial parent shall be entitled to the exemption for the child and that parent provides at least $600.00 yearly for the child's support. The definition of a qualified pre–1985 instrument is stated in subsection 152(e)(4)(B) as:

> For purposes of this paragraph, the term "qualified pre–1985 instrument" means any decree of divorce or separate maintenance or written agreement—
> (i) which is executed before January 1, 1985,
> (ii) which on such date contains the provision described in subparagraph (A)(i), and
> (iii) which is not modified on or after such date in a modification which expressly provides that this paragraph shall not apply to such decree or agreement.

■ The parties stipulated to the distribution of the tax exemptions for the children in a separation agreement filed with the court in 1983. The distribution was incorporated in the verified amended complaint also filed that year. Subparagraphs (i) and (ii) of subsection 152(e)(4)(B) are satisfied by the 1983 filings. There was no written modification prior to January 1, 1985, which expressly revoked the distribution of tax exemptions during the period the stipulation and separation agreement was in effect. Therefore, defendant was entitled to the two exemptions as stipulated prior to the entry of the decree of divorce.

■ However, plaintiff's amended complaint in 1985 put the distribution of tax exemptions at issue in the divorce proceeding. The provisions of the separation agreement were no longer effective. Plaintiff requested the tax exemptions for all three children but the trial court's order did not honor that request. This result is contrary to the general provisions of section 152(e). Any argument that the stipulation and separation agreement qualifies as a pre–1985 instrument, where plaintiff willingly relinquishes her right to the exemptions under federal law, neglects plaintiff's rejection of its terms in the *post-divorce* period. By amending her complaint, plaintiff modified and affirmatively rejected the pre-divorce distribution. Plaintiff is entitled to the tax exemptions for all of the children in view of the award of custody to her and the failure of defendant to establish any exception to the general rule stated above.

## AWARD OF ATTORNEY FEES

■ Plaintiff argues the trial court abused its discretion in awarding attorney fees of only $2,500.00 when she asked for $7,871.00. Plaintiff clearly demonstrated a need for assistance. The court recognized that need by making the award. However, the court considered a written statement of attorney fees as a basis for the award. Extensive fees were generated by interest and preparation of the expert testimony offered to support the valuation of the medical degree. That argument was rejected by the lower court. We find no abuse of discretion in the award.

Because defendant did not cross appeal on this issue, we do not consider whether there was sufficient evidence presented to the trial court to justify any award of attor-

---

1. The decree of divorce utilizes the term "deduction" and the United States Code utilizes "exemption" when referring to the individual al- lowance subtracted from income when computing tax owed.

ney fees. *Newmeyer v. Newmeyer*, 745 P.2d 1276 (Utah 1987).

## AWARD OF CHILD SUPPORT

■ Utah Code Ann. §§ 78–45–3,–4 (1987) establish the obligation of both parents to support their children and "[a] child's right to that support is paramount." *Woodward v. Woodward*, 709 P.2d 393, 394 (Utah 1985). The Utah Supreme Court continued "The trial court may fashion such equitable orders in relation to the children and their support as is reasonable and necessary, considering not only the needs of the children, but also the ability of the parent to pay." *Id.* Plaintiff contends the award of $300.00 per month per child was so inordinately low that it constituted an abuse of discretion by the trial court. We agree.

The trial court found defendant's gross income was $100,000.00 per annum or $8,333.00 per month, at the time of the divorce, while it determined plaintiff's gross income was $1,033.00 per month.[2] The court found that plaintiff had monthly expenditures of $2,050.00 and was in need of financial assistance from defendant to assist the children "in maintaining a standard of living more comparable to that enjoyed by their father."

Assuming the three children spend the majority of the year with plaintiff, her gross monthly income, including awarded child support and alimony, is $2,333.00. After taxes have been deducted from the portions of income subject to taxation, plaintiff's net monthly income approximates her meager monthly expenses leaving no leeway for emergencies, presently necessary replacement expenditures, or any amenities of life. Under such grim economic reality, the children who reside with their mother will not enjoy a standard of living remotely comparable to that of their father.

The award established by the trial court cannot be justified when applying the factors listed in Utah Code Ann. § 78–45–7(2) (1987).[3] We find plaintiff and her children are left in a precariously balanced financial existence while defendant is relatively affluent. Plaintiff and the children are in great need of assistance. The defendant has no responsibility for the support of anyone other than plaintiff, the children, and himself.

At the present time the courts of this state do not have uniform guidelines to employ in determining an award of child support.[4] Many other jurisdictions, however, have established child support guidelines or schedules, based upon current economic data as to the cost of rearing children, to be used by trial courts. Although we do not use the numbers or approaches in fashioning the award in this case, a general comparison illustrates the inadequacy of the award. Because these formulas are based upon adjusted incomes, we cannot directly compare the numbers. Nevertheless, it is clear that under each, the support would be much higher. For example, in Colorado, an income shares guideline state, the award would be approximately $1,535.00. Under Wisconsin's Child Support Guidelines, which were recently adopted by our neighboring states of Idaho and Nevada, where only the noncustodial parent's income is considered and where 29% of gross income is the presumptive award, the child support for the three children would be $2,320.00.

---

2. The lower court also found that plaintiff expected a 25% reduction in her salary because of a voluntary transfer to a less stressful position within her employment.

3. Section 78–45–7(2) lists the following factors to be considered in awarding prospective support:
   (a) the standard of living and situation of the parties;
   (b) the relative wealth and income of the parties;
   (c) the ability of the obligor to earn;
   (d) the ability of the obligee to earn;
   (e) the need of the obligee;
   (f) the age of the parties;
   (g) the responsibility of the obligor for the support of others.

4. This Court notes, however, that a Task Force established by the Judicial Council is presently investigating the propriety of adopting Uniform Child Support Guidelines for Utah based upon current economic data.

■ Under the economic circumstances of this case, the award of child support is inequitable and must be modified. The dissent argues the case must be remanded to determine the children's need and the ability of each party to pay child support. We note the findings of fact do not fully address the child support factors. However, we believe this not to be reversible error because the totality of the factual evidence in the record is "clear, uncontroverted, and capable of supporting only a finding in favor of the judgment" of the need for child support. *Acton v. Deliran*, 737 P.2d 996, 999 (Utah 1987); *Marchant v. Marchant*, 743 P.2d 199, 202 (Utah App.1987). The record is also replete with the financial needs of the children and the relative abilities of plaintiff and defendant to meet those needs. Nothing could be gained by a remand for this purpose except a delay of the increased award. Based upon the above reasoning, we award the sum of $600.00 per month per child, support to continue to age 21 if the child is a full time student and not married.[5] On remand, the trial court shall enter its order for child support in accordance with Utah Code Ann. § 30–3–5.1 (1987).

## AWARD OF ALIMONY

■ The standard of review relating to alimony requires that we not disturb the trial court's award unless "such a serious inequity has resulted as to manifest a clear abuse of discretion." *English v. English*, 565 P.2d 409, 410 (Utah 1977). The Utah Supreme Court in that often quoted case states that "the most important function of alimony is to provide support for the wife as nearly as possible at the standard of living she enjoyed during marriage, and to prevent the wife from becoming a public charge." *Id.* at 411. The Court continued that a trial court should consider "the financial conditions and needs of the wife, the ability of the wife to produce a suffi-

cient income for herself; and the ability of the husband to provide support." *Id.* at 411–12.

In *Jones v. Jones*, 700 P.2d 1072 (Utah 1985), the Court conducted an extensive analysis of these three factors. Although the trial judge carefully considered the factors outlined in *Jones*, because plaintiff and the children were living in an artificially depressed standard of living, the award of only $400.00 per month of terminable alimony is inadequate. We refuse to penalize plaintiff for trying to live within her means and failing to show higher necessary expenses.[6]

An application of one of the *English* standards could justify the award made in this case. Plaintiff endured a poor standard of living during the marriage. She had little money to spend then so she should have little now. That result will preserve "the standard of living she enjoyed during marriage." But such a result is unfair. A divorce court is a court of equity. It is not equitable to preserve the status of limited income for one party and affluence for the other when the one sacrificed to help the other achieve such affluence. When the totality of the *English* standards are applied the award is clearly inadequate.

The court below also abused its discretion in limiting the award of alimony to a period of five years; being nonterminable by reason of remarriage for three years. In *Olson v. Olson*, 704 P.2d 564 (Utah 1985), the Utah Supreme Court analyzed a similar fact situation wherein the plaintiff wife was a high school graduate and had spent the majority of the marriage bearing and rearing the parties' six children. Defendant husband was a well paid consultant who provided his services to governmental agencies on a contract basis. While affirming the award of alimony in the amount of $1,600.00 per month, the Court modified the award by striking its two-year

---

5. The award to age 21 was made by the trial court pursuant to Utah Code Ann. § 15–2–1 (1986).

6. A review of plaintiff's expenses shows them to be extremely low and based upon what she

actually spent rather than estimates of what she needed to sustain herself and her children at a reasonable standard of living based upon the total family income.

limitation and making the alimony permanent subject to future changed circumstances. In support of its modification, the Court pointed to the wife's limited education, her lack of work experience, and that she had "no reasonable expectation of obtaining employment two years hence that will enable her to support herself at a standard of living even approaching that which she had during the marriage." *Id.* at 567. *See also Paffel v. Paffel,* 732 P.2d 96, 103 (Utah 1986).

For the reasons stated previously and based upon the facts in the record, we hold that plaintiff is entitled to an award of alimony on a continuing basis and we award permanent alimony in the sum of $750.00 per month subject to the provisions of Utah Code Ann. § 30–3–5 (1987).

## THE MEDICAL DEGREE AND AWARD OF EQUITABLE RESTITUTION

■ We next must determine whether defendant's medical degree is marital property subject to division. In the recent case of *Gardner v. Gardner,* 748 P.2d 1076 (Utah 1988), the Utah Supreme Court discussed this problem and noted that there is authority from other jurisdictions on both sides of the issue. However, this Court, in *Petersen v. Petersen,* 737 P.2d 237, 239–42 (Utah App.1987) and *Rayburn v. Rayburn,* 738 P.2d 238, 240 (Utah App.1987), analyzed the issue and held that a medical degree is not marital property subject to division in a divorce decree. We agree with the Utah Supreme Court "that an educational or professional degree is difficult to value and that such a valuation does not easily fit the common understanding of the character of property." *Gardner,* 748 P.2d at 1081. The Court in *Gardner* was not required to address the issue because there was significant other property accumulated during the marriage resulting from the increased earning capacity afforded by the medical degree and the numerous years the Gardners enjoyed the standard of living afforded by the medical degree. That is not the case here. The Court noted, "The cases which have refused to hold that professional degrees and practice constitute marital property subject to valuation and distribution have nonetheless assessed and divided the value of the degree or practice on the basis of other legal and equitable remedies." *Id.* at 1080–81. The Court described the common fact pattern applicable to this acknowledgment of the degree's equitable worth as a situation where "the husband is supported throughout a long graduate or professional program by the working wife, and the couple is divorced soon after graduation. In such cases, there are few marital assets to distribute, and the courts have considered other ways of compensating the spouse." *Id.* at 1081. This is essentially the situation presented here. While this marriage has continued for many years the only assets are the home and the enhanced earning capacity of defendant. The earning capacity must be recognized in fashioning those "legal and equitable remedies" necessary to assist plaintiff to readjust her life. The valuation and distribution of the medical degree in this case is not a viable alternative. Valuation would be speculative in the extreme, and distribution ignores the fact that the degree is personal to defendant.[7] We prefer to follow the majority rule, upheld in *Petersen* and *Rayburn,* that a medical degree is not subject to valuation and distribution in a divorce. However, this case is a striking example of a highly paid professional disposing of his wife with a minimum amount of support just as that professional is reaching a level of income for which both the professional and his wife have striven. This prevents the wife

---

7. It is argued that estimating the value of a medical degree is no more speculative than measuring damages in a wrongful death case. However, in wrongful death, the measurement begins at death and is subject to no future variables introduced by the decedent. Here, we must guess at the future course of defendant's career. Will he continue to practice in the same specialty in the same locale? A future decision or happenstance could totally change or even terminate the value of the medical degree. Can defendant then return to court to change the valuation and distribution based upon the more certain circumstances? Could plaintiff prevent defendant from making decisions which could impact the value of the degree?

from enjoying the benefit of *her labor and sacrifice* in support of her husband's goals. *See generally* L. Weitzman, The Divorce Revolution, ch. 5, 124–35 (1985).

From the time of the marriage in 1968 until their separation in 1982, the parties enjoyed few of the material pleasures of life. The court found that "During the 14 years that the parties lived together, plaintiff assisted extensively in Defendant's obtaining a college education, medical degree and internship. In addition, plaintiff made substantial sacrifices in order to facilitate the completion of Defendant's medical schooling and internship."[8] Plaintiff accepted the sacrifices necessary to support defendant's aspirations in anticipation of future benefits. The trial record shows the following exchange:

Q. Okay. Was there any discussion of future benefits that would be obtained through this?

A. Yes. He [defendant] told me that if I would sacrifice, and if I would see it through, that someday he would make it up to me and we would have material items that we had gone without. And his hours would be flexible and he would have more time to spend with himself and the children. If we would just be patient.

Defendant offered no rebuttal to the exchange.

This Court in *Petersen*, 737 P.2d at 242, foresaw the situation now at issue. Writing for the Court, Judge Orme recognized that an occasion might arise whereby one spouse was reaching a high level of income just at the time of divorce rather than the more frequent situation in which the parties had enjoyed the benefits of the husband's medical education for a number of years. Judge Orme wrote:

In cases like the instant one, life patterns have largely been set, the earning potential of both parties can be predicted with some reliability, and the contribu-

tions and sacrifices of the one spouse in enabling the other to attain a degree have been compensated by many years of the comfortable lifestyle which the degree permitted. Traditional alimony analysis works nicely to assure equity in such cases.

In another kind of recurring case, typified by *Graham* [*In re Marriage of Graham*, 194 Colo. 429, 574 P.2d 75 (1978)], where divorce occurs shortly after the degree is obtained, traditional alimony analysis would often work hardship because, while both spouses have modest incomes at the time of divorce, the one is on the [threshold] of a significant increase in earnings. Moreover, the spouse who sacrificed so the other could attain a degree is precluded from enjoying the anticipated dividends the degree will ordinarily provide.... In such cases, alimony analysis must become more creative to achieve fairness, and an award of "rehabilitative" or "reimbursement" alimony, not terminable upon remarriage, may be appropriate. *See, e.g., Haugan v. Haugan*, 117 Wis.2d 200, 343 N.W.2d 796 (1984); *Mahoney v. Mahoney*, 91 N.J. 488, 453 A.2d 527 (1982).

*Id.* at n. 4. This is the situation where our analysis "must become more creative to achieve fairness." *Id.* Equity demands a recognition of the sacrifices and contributions made by plaintiff in support of defendant's medical education. The defendant has been enriched by plaintiff's efforts and, therefore, plaintiff has earned an award of some permanent financial benefit, in her own right, that will allow her to share in the economic benefits achieved through their joint efforts. The modified award of traditional alimony merely maintains plaintiff on a plane modestly above that experienced by the parties during the marriage. Even this modest award may be lost through the happening of some future circumstance.[9] The dissent would restrict

---

**8.** We must wonder whether defendant could have or would have entered and completed medical school had plaintiff obtained a divorce earlier. Defendant likely would have been obligated to pay alimony and child support. He would probably not have had the benefit of the

family home and surely would not have had the benefit of plaintiff's part-time work.

**9.** Traditional alimony forces the recipient to make future choices with the understanding that such choices may result in the loss of ali-

plaintiff to an award of traditional alimony based upon defendant's newly acquired level of income. Because there has been little property accumulated and because the income was acquired after separation, plaintiff is entitled to a more permanent remedy.

This issue has engendered much case law. Many courts have held that a professional degree is not marital property subject to distribution but nevertheless believe some remedy must be created for the spouse who supported the attainment of that degree. A threshold factor is the meaning of "support" when the term is applied to the efforts of the non-professional spouse. Must "support" equate to direct financial assistance provided through full time employment while the student spouse devotes his or her full time efforts to course work? Is "support" rendered by a spouse whose full time activities are devoted to providing a home environment for the student spouse and family? Here, plaintiff bore the children, was the principal in providing child care and maintaining the domestic setting, and was also employed part-time for several years while defendant attended medical school. To hold that plaintiff's only value is the income she generates ignores the value of her contributions in every other aspect of family life. The logical conclusion is that motherhood and nurturing of children is valueless; that preserving and maintaining a home is worthless; that the functions of mother, homemaker, and helpmate contribute nothing of value to a family. We refuse to so limit our definition of support. Certainly, our Supreme Court in analyzing traditional property distributions has never limited a wife to recovering only what she monetarily contributed to the marriage. *Huck v. Huck*, 734 P.2d 417 (Utah 1986). We hold in accordance with the court's finding that

plaintiff contributed to and supported defendant's educational achievements.

The case law remedies in this situation establish a spectrum, from those narrowly focusing on financial support provided to the professional spouse, while he or she was a student, to those which consider the totality of the non-professional spouse's efforts in the family venture to obtain economic stability through education. For example, in *Hubbard*, 603 P.2d at 747, the wife was allowed to recover from her physician husband contributions to his direct support, school and professional training expenses, plus reasonable interest and adjustments for inflation.

A case recognizing more than strict financial contributions is *Saint–Pierre v. Saint–Pierre*, 357 N.W.2d 250 (S.D.1984), in which the Supreme Court of South Dakota held, "in a proper case," the trial court should consider "all relevant factors" in awarding "reimbursement or rehabilitative alimony." These included "the amount of the supporting spouse's contributions, his or her foregone opportunities to enhance or improve professional or vocational skills, and the duration of the marriage following completion of the nonsupporting spouse's professional education." *Id.* at 262.

In *Washburn v. Washburn*, 101 Wash.2d 168, 677 P.2d 152, 159 (Wash.1984), the Supreme Court of Washington listed and analyzed several factors the trial court must consider "in determining the proper amount of compensation for the supporting spouse." These include the supporting spouse's contributions for direct educational costs, no more than one-half what the couple would have earned had "the efforts of the student spouse not been directed towards his or her studies," "[a]ny educational or career opportunities which the supporting spouse gave up in order to ob-

mony. *See* Utah Code Ann. §§ 30–3–5(5) and (6) (1987). No one should be forced into making such choices, particularly when the other party, who enjoys his position through the joint efforts of both parties, is under no similar restrictions on behavior. We note what the Oklahoma Supreme Court wrote in *Hubbard v. Hubbard*, 603 P.2d 747 (Okla.1979), when responding to the argument that the wife's recovery

from her physician husband, whom she helped through medical school, be limited to alimony for support and maintenance. The per curiam decision reasoned "To do so would force her to forego remarriage and perhaps even be celibate for many years simply to realize a return on her investments and sacrifices of the past twelve years." *Id.* at 752 (footnote omitted).

tain sufficiently lucrative employment, or to move to the city where the student spouse wished to attend school[,]" and "[t]he future earning prospects of each spouse, including the earning potential of the student spouse with the professional degree."

Wisconsin statutes allow a trial court to grant an order requiring maintenance payments to either party after considering several factors. Among these are:

(4) The educational level of each party at the time of marriage and at the time the action is commenced.

(5) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.

(6) The feasibility that the party seeking maintenance can become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and, if so, the length of time necessary to achieve this goal.

. . . .

(8) Any mutual agreement made by the parties before or during the marriage, according to the terms of which one party has made financial or service contributions to the other with the expectation of reciprocation or other compensation in the future, where such repayment has not been made, or any mutual agreement made by the parties before or during the marriage concerning any arrangement for the financial support of the parties.

(9) The contribution by one party to the education, training or increased earning power of the other.

Wis.Stat. § 767.26 (1982), *See also Haugan v. Haugan*, 117 Wis.2d 200, 343 N.W.2d 796, 800–01 n. 4 (Wis.1984).

■■■ Clearly, some jurisdictions which require courts to examine and value the contributions to a marriage partner's development. This appears to be the fair and equitable approach. Therefore, we hold that plaintiff is entitled to an award of "equitable restitution" in addition to traditional alimony. We use the term equitable restitution to describe the award in order to establish a clear distinction between it and traditional alimony or any other form of spousal maintenance or support. The function of equitable restitution is to enable a spouse to share the *newly obtained* earning capacity of a former spouse who has achieved that capacity through the significant efforts and sacrifices of the requesting spouse which were detrimental to that spouse's development. It is nothing more than an equitable sharing of the rewards of both parties' common efforts and expectations.[10]

■■■ Factors to be analyzed in determining an award of equitable restitution include, but are not limited to: (1) the length of the marriage; (2) the financial contributions and personal development sacrifices made by the requesting spouse; (3) the duration of these contributions and sacrifices during the marriage; (4) the resulting disparity in earning capacity between the requesting spouse and the spouse benefited thereby; and (5) the amount of property accumulated during the marriage.[11] An award of equitable restitution will not terminate upon plaintiff's remarriage, and may be payable in lump

---

**10.** We emphasize the specific nature of the facts presented in this case and stress that equitable restitution would not be awarded in the more frequent case where the marriage lasted for many years after the professional degree had been granted. There, sufficient assets would have been accumulated and an appropriate distribution to the requesting spouse would enable that spouse to share in the economic benefits earned as a result of the degree.

**11.** Because this case establishes a new form of spousal award, we hesitate to state that the enumerated factors in determining equitable restitution are all inclusive as of the writing of this opinion. *See Biswell v. Duncan*, 742 P.2d 80, 86 n. 5 (Utah App.1987).

sum or periodically over time depending on the circumstances of each case.[12]

## CONCLUSION

The judgment of the trial court is affirmed in part and reversed in part. The case is remanded to the trial court for the purpose of taking any further evidence that may be necessary to determine the amount of equitable restitution to be awarded to plaintiff and its manner of payment and for entry of judgment pursuant to this opinion. Costs against defendant.

BILLINGS, J., concurs.

JACKSON, Judge (dissenting):

I respectfully and loyally dissent.

Loyal to the majority, but not to their opinion, I flag their decision as being at the forefront of judicial activism. I regret that I could not dissuade my colleagues from breaking new ground with the invention of "equitable restitution." The opinion manufactures a divorce remedy that is (1) outside our statutory scheme;[1] (2) without precedent in the pronouncements of the Utah Supreme Court; (3) not requested by the appellant;[2] (4) forced on the trial courts for further development; (5) not needed to do justice to the parties in this case and may, in fact, work inequity.

## EQUITABLE RESTITUTION OR SUPPORT

In *Petersen v. Petersen*, 737 P.2d 237 (Utah App.1987), this court held that an advanced degree is not marital property subject to division upon divorce, even where this achievement has been made possible through the assistance of the other spouse. We have, nonetheless, acknowledged that there may be situations where equity demands an extraordinary award of nonterminable rehabilitative or reimbursement alimony in order to compensate a spouse who "endure[s] substantial financial sacrifices or defer[s] her own education to help" the other spouse in obtaining an advanced degree. *Rayburn v. Rayburn*, 738 P.2d 238, 241 (Utah App.1987). This might occur where: (a) the parties mutually endeavor to increase one spouse's earning capacity, but at the time of trial the spouse who has benefitted from the parties' endeavors is merely on the threshold of a substantial increase in earnings, *Petersen*, 737 P.2d at 242 n. 4; or (b) there is insufficient marital property from which to make a compensatory award to the contributing spouse. *See Gardner v. Gardner*, 748 P.2d 1076, 1081 (Utah 1988). In such cases, the spouse who has made substantial financial sacrifices and contributions to increase the earning capacity of the other spouse is entitled to recompense for those contributions that are beyond the duty of support normally associated with marriage, less any benefits received. *See, e.g., Roberto v. Brown*, 107 Wis.2d 17, 318 N.W.2d 358 (1982); *Mahoney v. Mahoney*, 91 N.J. 488, 453 A.2d 527 (1982).

Decisions from other jurisdictions involving compensation of the spouse who has contributed to the attainment of an ad-

---

12. For example, in following the Utah Supreme Court's admonishment against unnecessarily tying a couple together after divorce as stated in *Gardner*, 748 P.2d at 1079, defendant's lien on the family home might be extinguished and the amount credited against the overall award of equitable restitution. We recognize that this would probably be only a fraction of the total amount of equitable restitution awarded.

1. The majority acknowledges the existence of our divorce statutes in remanding the child support and alimony issues. The majority states: (a) "On remand, the trial court shall enter its order for child support in accordance with Utah Code Ann. § 30-3-5.1 (1987)," i.e., raise the total amount of child support from $900 to $1,800 per month; (b) "[W]e award permanent alimo-

ny in the sum of $750 per month subject to the provisions of Utah Code Ann. § 30-3-5 (1987)," i.e., increase alimony from the $400 awarded by the trial court. However, no statute is cited as the basis for equitable restitution. Our divorce statutes and case law authorize only the distribution of property and an award of support for the benefit of the spouse and children. Utah Code Ann. §§ 30-3-1 to -10.6 (1987).

2. Mrs. Martinez argued both at trial and on appeal that a professional degree is a property interest subject to division upon divorce. Since equitable restitution was not a part of Utah law until this majority opinion was crafted, the trial was not conducted and the evidence was not presented under that theory.

vanced degree have generally involved four factors:

> [F]irst, they share the loss of the husband's foregone earnings during the period of investment; second, the wife provides the financial capital to enable her husband to forego those earnings; third, she may forego opportunities to further the development of her own earning capacity; fourth, and most significantly, they both expect to gain a return on the full costs of the investment through continuation of the marriage. Thus, the working spouse predicates her sacrifice of income and personal educational advancement on the expectation of future returns to her from sharing in her husband's enhanced earning capacity.

Krauskopf, *Recompense for Financing Spouse's Education: Legal Protection for the Marital Investor in Human Capital*, 28 Kan.L.Rev. 379, 380 (1980).

The extraordinary award fashioned by the majority in this case is inappropriate for several reasons. First, Mrs. Martinez did not provide the financial capital that enabled her husband to attain his college and advanced degree. Instead, Dr. Martinez provided the bulk of the family's financial support, in addition to paying for his education. This is not the classic "working spouse/student spouse" situation necessitating an extraordinary award. *See, e.g., Hubbard v. Hubbard,* 603 P.2d 747 (Okla.1979); *Haugan v. Haugan,* 117 Wis.2d 200, 206, 343 N.W.2d 796, 799–800 (1984); *Roberto,* 318 N.W.2d 358.

Second, no evidence was presented that Mrs. Martinez deferred her own career or education in order to advance the education of her husband. Both parties had only high school educations at the time of marriage. Mrs. Martinez testified at trial that she wanted to continue her own education someday but had not yet begun doing so, even though her employer would pay three-fourths of her school costs and would allow her to continue working.

While Mrs. Martinez raised the children and performed the household responsibilities, Dr. Martinez provided the family's primary financial support in the form of his inheritance monies, funds from student loans (which the trial court required him to repay), and proceeds from his G.I. Bill. Mrs. Martinez worked part-time during three of the seventeen years of their marriage. Her nominal total earnings of approximately $2,300 were applied to family living expenses. During the marriage, the family took modest vacations, purchased two homes, furniture and furnishings, and two automobiles. Equity simply does not demand an extraordinary remedy in this case because no extraordinary injustice is present.

Even if Mrs. Martinez had made substantial financial contributions or educational sacrifices in order to further her husband's education and career, there are other reasons why the creation of a new hybrid award of equitable restitution is not warranted in this case. Unlike the hypothetical case contemplated by this court in *Petersen,* 737 P.2d at 242 n. 4, in which the spouse with an advanced degree is only on the threshold of reaping an enhanced income at the time of the parties' divorce, Dr. Martinez was already earning a gross annual income of $100,000. He is not merely at the threshold of significant earnings; he is already standing in the parlor. In addition, the parties here accumulated real and personal property from which a compensatory property award could be made: $34,561 equity in a home; three vehicles worth $3,995; an IRA account valued at $2,000; stocks of unknown value; and household furnishings valued at $6,500. The presence of both substantial earnings and accumulated property at the time of the divorce provides an adequate basis for rendering an extraordinary remedy, if Mrs. Martinez is entitled to recompense.

On the facts presented in this case, there are additional reasons why I believe the majority's disposition of this appeal is misguided: (1) equity can be achieved under current alimony and property distribution statutes and case law; (2) an award of equitable restitution coupled with the majority's generous alimony and child support awards is double-dipping; and (3) an award of equitable restitution, in effect, treats the

professional education as "property" subject to division upon dissolution of a marriage.

First, in fashioning an award of alimony, the trial court must consider the financial condition and needs of the recipient spouse,[3] the ability of that spouse to be self-supporting, and the ability of the other spouse to pay. *Paffel v. Paffel,* 732 P.2d 96, 100–01 (Utah 1986); *Jones v. Jones,* 700 P.2d 1072, 1075 (Utah 1985).

Dr. and Mrs. Martinez were married for approximately seventeen years. The trial court found that Dr. Martinez incurs expenses associated with his employment of approximately $7,000 per year, leaving approximately $93,000 annually or $7,750 per month. Mrs. Martinez earned approximately $1,033 per month and estimated that she required $2,050 per month to meet the expenses for herself and the three children. Under the temporary support order, she had been receiving $1,100 per month in child support. She sought additional monies to make up the difference between her net earnings and expenses and to provide her with the means to make major house repairs. In the event that a professional degree was not viewed as a marital asset, she sought an alimony award not subject to termination upon remarriage.

The trial court stated that it considered the large disparity between the parties' respective earning abilities and the fact that the wife's resources were inadequate to meet her needs. However, I agree with Mrs. Martinez that the trial court failed to apply these factors correctly in that the award of $400 per month alimony, nonter-

minable for three years and continuing for a period of five years, is so low as to constitute a clear and prejudicial abuse of discretion. Mrs. Martinez earns $1,033 gross income per month. The alimony awarded by the trial court, plus her net monthly earnings of $846, provides her with approximately $1,246 with which to meet her monthly expenses, excluding sums awarded for child support. In contrast, Dr. Martinez enjoys approximately $7,750 gross monthly income. Considering the disparate earning capacities, the trial court's alimony award was insufficient and inequitable in that it failed to provide the parties with a comparable standard of living.

Second, based on Dr. Martinez's earnings at the time of trial, the majority has increased total child support from $900 to $1,800 and increased the duration and amount of alimony to a permanent award of $750 per month. An award of equitable restitution on top of the already generous awards of alimony and child support fashioned by the majority is duplicative and not necessary to achieve equity.

Finally, an advanced degree is the memorialization of an individual's "attainment of the skill, qualification and educational background which is the prerequisite of the enhanced earning capacity." *Wehrkamp v. Wehrkamp,* 357 N.W.2d 264, 266 (S.D. 1984); *cf. Petersen,* 737 P.2d at 240 (quoting *In re Marriage of Graham,* 194 Colo. 429, 574 P.2d 75 (1978) (en banc)). The value of an advanced degree lies in the potential for increased earnings made possible by the degree and by other factors

---

**3.** In determining the "need" of the recipient nonstudent spouse, the trial court is not limited to considering only the low living expenses incurred during the time that the other spouse studied to obtain an advanced degree. The Utah Supreme Court recently stated in *Gardner,* a case also involving an advanced degree, that alimony should "equalize the parties' respective standards of living and maintain them at a level as close as possible to the standard of living enjoyed during the marriage." *Gardner,* 748 P.2d at 1081; *accord Boyle v. Boyle,* 735 P.2d 669, 671 (Utah App.1987); *Petersen,* 737 P.2d at 239; *Olson v. Olson,* 704 P.2d 564, 566 (Utah 1985); *Higley v. Higley,* 676 P.2d 379, 381 (Utah 1983). Although *Gardner* involved a marriage

in which the parties enjoyed a high standard of living for many years prior to the divorce, the language of *Gardner* was clearly aimed at preventing the divorced spouse of a high income earner from suffering a major decline in standard of living following a divorce. This language should not be construed as prohibiting a trial court from making an award that raises the recipient spouse's standard of living from what it was during the marriage where, as here, the student spouse experiences a major increase in earnings just prior to the marriage's termination. In other words, the "need" of the recipient spouse in this situation is not necessarily what he or she managed to live on during the lean school years.

and conditions of employment. If the advanced degree itself does not fall within the classification of marital "property" subject to distribution upon divorce, then neither should an individual's enhanced earning capacity. *Hodge v. Hodge*, 337 Pa.Super.Ct. 151, 486 A.2d 951 (1984); *Wehrkamp*, 357 N.W.2d at 266; *Stern v. Stern*, 66 N.J. 340, 331 A.2d 257 (1975).

The majority declares that:

The function of equitable restitution is to enable a spouse to share the *newly obtained* earning capacity of a former spouse who has achieved that capacity through the significant efforts and sacrifices of the requesting spouse which were detrimental to that spouse's development. It is nothing more than an equitable sharing of the rewards of both parties' common efforts and expectations.

By creating a divisible interest in Dr. Martinez's enhanced earning capacity, this court has awarded a nonterminable property interest in a medical degree which goes beyond the compensation approved in *Petersen*. The majority has not limited its award to Mrs. Martinez's contributions toward her husband's medical education costs; it has taken the further step of providing financial recompense for lost expectations. I would reject any compensation formula based on future earning capacity. The factors and variables involved in the valuation of an enhanced earning capacity are as speculative as those involved in an attempt to value an advanced degree; such speculation can only lead to inequity.

Provision for Mrs. Martinez's needs is best dealt with through a generous but fair distribution of property and award of alimony,[4] not through the creation of a distinctly new form of cleverly disguised marital property for which there is no precedent.

## CHILD SUPPORT

Both husband and wife have a duty to support their children. Utah Code Ann. §§ 78–45–3, –4 (1987). "Child support awards should approximate actual need, and, when possible, assure the children a standard of living comparable to that which they would have experienced if no divorce had occurred." *Peterson v. Peterson*, 748 P.2d 593, 596 (Utah App.1988).

The trial court found that Dr. Martinez earned approximately $7,750 gross income per month. Dr. Martinez testified that his earnings were established under a two-year employment contract, that he was in the 50% tax bracket, and that he had no tax shelter. The trial court also found that Mrs. Martinez earned approximately $1,033 gross income per month. Mrs. Martinez testified to net monthly earnings of $846 plus nominal royalties from an oil well. She anticipated a reduction in her earnings as a result of her voluntary cutback in working hours. Mrs. Martinez calculated monthly living expenses for herself and the three children at $2,050. This was the only evidence of the dollar amount of the children's monthly need for support. The majority has elected to disregard that evidence because they think the figure was too low. Having rejected the only evidence of the children's need, the majority makes its own independent estimate.

Using their own estimate of need and the parties' gross monthly incomes, the majority has awarded $600 per month per child for a total of $1,800.[5] Their action fails to

**4.** Unlike the majority's award of equitable restitution, an alimony award can be modified, in appropriate circumstances, under the court's exercise of continuing jurisdiction. Utah Code Ann. § 30–3–5(3) (1987). This is particularly important in the situation presented here, where Dr. Martinez is working under a contract of limited duration.

**5.** The majority opinion interchanges the terms "adjusted gross income" and "gross income" in comparing the amount of child support awarded by the trial court with an award calculated under guidelines from Colorado and Wisconsin, even though the terms have markedly different meanings. Although the majority disclaims reliance on the child support guidelines from other jurisdictions, they do, in fact, rely upon potentially greater amounts available in other jurisdictions in order to justify an award of $600 per month per child.

The problem with this analysis is that the guidelines adopted by other jurisdictions are irrelevant for purposes of an award in Utah.

account for the effects on each party of: (1) tax rate changes under the 1986 Tax Reform Act;[6] (2) their award of the tax exemptions for all the children to Mrs. Martinez; (3) the disposition of the home mortgage debt as discussed below; (4) their increase of alimony from $400 to $750 per month; and (5) their equitable restitution award in an amount to be determined by the trial court.

I would remand this case on the child support issue for the taking of further evidence and a current determination of the children's need and the ability of both parents to pay child support, to be considered with the other appropriate adjustments in the parties' incomes and liabilities.

## HOME MORTGAGE

The parties stipulated at trial that their jointly-acquired home had a current market value of $63,000 and an equity of $34,561. The stipulated figures reveal the existence of a home mortgage obligation in the sum of $28,439. However, neither the trial court nor counsel identified this sizeable debt in the distribution of debts and property. Nor do the trial court's written Findings of Fact specify who must assume the $28,439 mortgage obligation and make the payments. The record reveals that Mrs. Martinez had been making a $309 monthly mortgage payment and the court stated that each party was to assume and dis-

charge those debts that they have been paying.

Paragraph 19 of the written Findings of Fact states that the "[p]laintiff [Mrs. Martinez] should be awarded the exclusive use and occupancy of the parties' residence subject to a lien in favor of Defendant for the sum of $17,528.00 ..." The Decree of Divorce reiterates this language and awards plaintiff "exclusive use and occupancy," subject to a lien in defendant's favor. The court's oral ruling was: "[t]he Court will award to the the [sic] Plaintiff the home of the parties, subject to a lien for defendant's share of the equity in the amount of one-half of the net equity."

The court's allocation of the parties' financial obligations includes no reference to $28,439 of mortgage debt. Mrs. Martinez was required to pay specified debts and obligations totalling $8,179.73. The $28,439 was not specified and does not appear in the record. Dr. Martinez was required to pay specified debts and obligations totalling $26,169.04. If Mrs. Martinez must assume and pay the house mortgage, her post-divorce debt responsibility is $36,618.73, $10,449.69 more than his.

Conclusion of Law C provides that, "[i]n order to make the distribution ... [of marital property] as equal as possible, Plaintiff should be awarded the real property ... subject to a lien in favor of Defendant for one-half of the present equity therein, that being for the sum of $17,678." Although

Child support guidelines utilize different approaches to allocate economic responsibility for children of divorced parents depending upon varying public policy. *See generally* Cassetty, "Emerging Issues in Child Support Policy and Practice," in *The Parental Child Support Obligation: Research, Practice and Policy* 3 (J. Cassetty ed. 1983).

As the majority opinion demonstrates, the recommended amount of child support under other jurisdictions' guidelines may radically differ because of differences in the underlying policy goals adopted by a given state. The guidelines of some states, such as Wisconsin, do not adjust for the income of the custodial parent. This is obviously inconsistent with Utah's adoption of a public policy which holds both parents responsible for the support of their children. For these reasons, whether the support guidelines in other states would afford a higher level of support should not be a factor in making an equitable award in Utah.

6. The Tax Reform Act of 1986 will have a significant impact on Dr. Martinez's disposable income, assuming ongoing gross income in the $100,000 range. He testified at trial that he had to set aside one-half of his income to pay taxes. For 1988 and later tax years, there are two basic tax rates for individuals, 15% and 28%. In addition, the law effectively creates a third rate of 33% on income above certain levels. Thus, portions of Dr. Martinez's income will be taxed at 15%, 28%, and 33% rather than all at 50%. Moreover, Utah income tax laws have changed in the interim. Counsel in divorce actions would be well advised to provide the trial court with complete information regarding the tax implications of the property distribution, alimony, child support and dependency exemption arrangements being proposed. The combined disposable income available to the severed family can often be increased by prudent tax planning during a divorce.

the stated objective is equality of distribution, the requirement that Mrs. Martinez assume and pay the mortgage would burden her by an additional $14,219.50 (½ of $28,439), despite the parties' widely disparate disposable income and the fact that Mrs. Martinez must support herself and the children on less than $2,200 per month. Since the court failed to specifically identify the home mortgage, the court also failed to include the amount of $28,439 in the equity calculation. Thus Mrs. Martinez became personally responsible to pay the major debt of the parties.

The trial court's inclusion of the home mortgage in Mrs. Martinez's debt burden as part of the property and debt distribution is an abuse of discretion, even without looking at the gross disparity of income. The home mortgage matter alone justifies a remand.

### CONCLUSION

The majority has fixed the amount of alimony and child support to be paid. This action deprives the trial court, on remand, of any flexibility to adjust the debts, property, alimony, and support awards and to fashion an overall award package that harmonizes all the variables. The trial court's discretion will be so restricted that an equitable outcome will be impossible. This case should instead be remanded for retrial on the alimony, child support and property distribution issues.